State v. Brown.

# THE STATE v. BROWN, Appellant.

## Division Two, May 13, 1902.

1. **Criminal Law:** MURDER: INDICTMENT: SUFFICIENCY. An indictment for murder, which charges that defendant made an assault on deceased with a gun, and did shoot and strike him, in and upon his body, one mortal wound, of which wound he died, is defective in not directly stating that deceased was "given" a mortal wound.

2. ——: ——: ——: OMISSION TO CHARGE MALICE. An indictment for murder in the first degree is bad if it fails to charge that the crime was committed with malice aforethought.

3. ——: ——: ——: FACTS UNKNOWN TO GRAND JURY. Where the manner of the commission of a murder and the weapons used are unknown to the grand jury, and not readily ascertainable, an indictment is not defective in charging that the manner of the killing and weapons employed are unknown.

4. ——: ——: TESTIMONY OF ACCOMPLICE. The evidence of an accomplice *held* sufficient, in a murder case, when considered in connection with other evidence, to sustain a conviction for murder in the first degree.

5. ——: ——: ——: SUFFICIENT IN ITSELF. The evidence of an accomplice considered, and *held* sufficient in itself, in a homicide case, to sustain a conviction for first degree murder.

6. ——: ——: CONTRADICTED STATEMENTS OF DEFENDANT. A statement by one accused of murder, to the wife of his victim, in answer to a question if the latter had been seen, that he had gone to the Klondyke, and that there was no use of hunting for him, is strong evidence against accused, even though he testifies—which testimony is contradicted—that deceased had stated that he was going to the Klondyke.

7. ——: ——: EVIDENCE: MEASURING DEFENDANT'S SHOE. Evidence that defendant in homicide manifested repugnance to having his shoe measured for the purpose of comparison with tracks near the scene of the homicide is admissible, but is not entitled to much weight.

Vol 168 mo—29.

State v. Brown.

8. ———: ———: ———: ———: OBJECTION: INCOMPETENT AND IMMATERIAL. The question of the admissibility, in a murder case, of evidence of defendant's conduct when his shoe was measured for the purpose of comparison with tracks near the scene of the homicide, is not raised by the objection that it is incompetent and immaterial.

9. ———: ———: ———: ACTS OF ACCUSED. Evidence of all the acts of a person accused of homicide, from which inferences of guilt may be drawn—as the removal of clothing from the person, blood stains, or attempt to conceal death by the destruction of the remains—are admissible against accused.

10. ———: ———: FAILURE TO INSTRUCT FULLY: NO EXCEPTIONS: APPELLATE PRACTICE. Where no exception that the instructions given in a homicide case do not cover all the questions of law involved is taken when the instructions are asked, such question will not be considered on appeal.

11. ———: ———: MOTIVE: INSTRUCTION. The refusal to instruct, in a homicide case, that the failure of the evidence to show motive for the crime on the part of defendant is a circumstance in his favor, which the jury should consider, is not erroneous, as the want of evidence of motive does not authorize an acquittal.

12. ———: ———: ———: TESTIMONY OF ACCOMPLICE. Where defendant in homicide can not be convicted unless the testimony of an accomplice, who testifies that deceased was killed for his money, is believed, an instruction as to the effect of the absence of evidence of motive is properly refused.

13. ———: ———: LETTER TO DECEASED: EVIDENCE. Evidence of a letter addressed to deceased, and received by his wife after his disappearance, stating the high wages paid in the Klondyke, is inadmissible in a prosecution for homicide, though remains found were incapable of being identified, and there was evidence that he had contemplated going to the Klondyke, as such letter could not have caused his departure.

14. ———: ———: MOTION FOR NEW TRIAL: GROUNDS TOO GENERAL. Grounds assigned for a new trial in a homicide case, that the court erred in admitting irrelevant and incompetent testimony over defendant's objection, and in refusing to receive legal, competent, and relevant testimony offered by defendant, are too general to be considered.

15. ———: ———: ———: STATEMENT OF IMPROPER REMARKS IN ARGUMENT: NO EVIDENCE. A statement in a motion for new trial in

State v. Brown.

a murder case that the prosecuting attorney was permitted to make improper remarks in argument is not evidence of such fact authorizing the relief demanded.

16. ————: "SUPPLEMENTAL BILL OF EXCEPTIONS." A so-called "supplemental bill of exceptions," filed in a homicide case after the time for filing the original bill, will not be considered on appeal, as such bill is unknown, but any change desired in the original bill must be by amendment.

Appeal from Wayne Circuit Court.—*Hon. Frank R. Dearing*, Judge.

AFFIRMED.

*Rainey* and *Munger* for appellant.

*Edward C. Crow*, Attorney-General, for the State.

(1) The third count of the indictment is good. The rule is that it is permissible to allege in the indictment that the name of the person or a fact necessary to be stated is unknown, when that name or fact is unknown and could not by the exercise of ordinary diligence have become known by the grand jury. State v. Stowe, 132 Mo. 199; State v. Thompson, 137 Mo. 623; Wharton's Crim. Plead. and Prac., 113; Com. v. Webster, 5 Cush. 295; People v. Cronin, 34 Cal. 191; State v. Burke, 54 N. H. 92; State v. Parker, 65 N. C. 453; State v. Wood, 53 N. H. 484; Cox v. People, 80 N. Y. 500. (2) The manner of a person accused of a crime when not under restraint, as well as his silence in such case, may be shown as inculpatory circumstances whose weight should be determined by the jury. State v. Hill, 134 Mo. 663. (3) The absence of a motive is not conclusive of the innocence of the defendant. It is only a circumstance in his favor. A defendant is not entitled to an acquittal merely because of the absence of a motive. "Motives for crime are often so unrea-

sonable that it is impracticable to require that they shall always be made manifest." State v. David, 131 Mo. 397.

SHERWOOD, P. J.—Charged with the murder of George L. Richardson, defendant was found guilty of that offense in the first degree, and after the usual motions, brings this cause here by appeal.

The indictment contains three counts, and is as follows:

"The grand jurors for the State of Missouri, duly impaneled, sworn and charged to inquire within and for the body of the county of Wayne, in the State of Missouri, upon their oath do present and charge that Sam Brown and William Grant, on the 20th day of March, 1900, at and in said county of Wayne and State of Missouri, then and there in and upon the body of one George L. Richardson, then and there being, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did make an assault and with a dangerous and deadly weapon, to-wit, a gun then and there loaded with gunpowder and leaden balls which they the said Sam Brown and William Grant in their hands had and held at and against him, the said George L. Richardson, then and there feloniously, on purpose and of their malice aforethought, willfully, deliberately and premeditatedly, did shoot off and discharge and with the gun aforesaid and the leaden balls aforesaid, then and there feloniously, on purpose and of their malice aforethought, willfully, deliberately and premeditatedly, did shoot and strike him, the said George L. Richardson in and upon the body of him, the said George L. Richardson, then and there with the deadly weapon aforesaid, to-wit, the gun aforesaid, and the gunpowder and the leaden balls aforesaid, in and upon the body of him, the said George L. Richardson, one mortal wound, of which mortal wound the said George L. Richardson then and there instantly died; and so the grand jurors aforesaid, upon their oath aforesaid, do

say that the said Sam Brown and the said William Grant, him, the said George L. Richardson, in the manner and by the means aforesaid feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did kill and murder; against the peace and dignity of the State.

"And so the grand jurors aforesaid, upon their oath aforesaid, do further present and charge that Sam Brown and William Grant, on the 20th day of March, 1900, at and in the county of Wayne in the State of Missouri, then and there, in and upon the body of one George L. Richardson, then and there being feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did make an assault and with a deadly and dangerous weapon, to-wit, a certain iron weapon and means, an exact description whereof to these jurors is unknown, which they, the said Sam Brown and William Grant, then and there in their hands had and held, then and there him, the said George L. Richardson, feloniously, deliberately and premeditatedly, did strike and beat him, the said George L. Richardson, on the head and body of him, the said George L. Richardson, thereby giving to him, the said George L. Richardson, then and there with the dangerous and deadly weapon aforesaid in and upon the body of him, the said George L. Richardson, certain mortal wounds, contusions, fractures and bruises of which said mortal wounds, contusions, fractures and bruises the said George L. Richardson, then and there instantly died; and so the grand jurors aforesaid, upon their oath aforesaid do say that the said Sam Brown and the said William Grant, him, the said George L. Richardson, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did kill and murder, against the peace and dignity of the State.

"And so the grand jurors aforesaid, upon their oath aforesaid, do further present and charge that Sam Brown and William Grant on the 20th day of March, 1900, at and in the

said county of Wayne and State of Missouri, then and there, in and upon the body of one George L. Richardson, then and there being, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did make an assault and him, the said George L. Richardson, in some way and manner and by some means, instruments and weapons to these jurors unknown, did then and there feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, kill and murder and deprive of life so that he, the said George L. Richardson, then and there died; and so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Sam Brown and William Grant, him, the said George L. Richardson, in some way and manner and by some means, instruments and weapons to these jurors unknown, did then and there feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, kill and murder, against the peace and dignity of the State."

1.   The first count is bad because of lacking the words "thereby giving to him the said George L. Richardson" or words of similar import.   Lacking these words, this count does not *directly* charge that George L. Richardson was "given" a mortal wound.   It is the inflexible rule in criminal pleadings that in all indictments for felonies, nothing can be left to intendment or implication.   [State v. Rector, 126 Mo. loc. cit. 340-41 (minority opinion); State v. Furgerson, 152 Mo. 92; Ibid., 162 Mo. 668; State v. Hagan, 164 Mo. loc. cit. 658, and authorities cited.]

2.   The second count is bad, because it omits to charge that the striking was done by Brown and Grant, *with malice aforethought.*   [Wharton Crim. Plead. and Prac. (9 Ed.), sec. 258.]

3.   The third count, however, is good; and it is competent for the grand jury when they do not know a fact, and such fact is not readily ascertainable, to state that such fact is unknown, and this will suffice.   [State v. Stowe, 132 Mo.

199, and cas. cit.] In this case, Grant, charged as an accomplice in the indictment, had never testified until upon the trial, and so there was no opportunity for the grand jury to ascertain what weapon was used in perpetrating the murder.

4. Before proceeding to discuss the merits of this cause, it is proper to give a general outline of the situation where the tragedy occurred, and of the surrounding neighborhood.

Brown, the defendant, was a tie-cutter, who had a family consisting of a wife and three little children, and lived in a small cabin, to which a tent was attached. About two hundred yards distant was the small pole cabin of George L. Richardson, also a tie-cutter, a man some forty-two years old, who had a wife about eighteen years old. About twenty-five yards from Brown's cabin, in another cabin, Levi Bounds, another tie-cutter, lived. But a little distance off from Brown's also lived a man named White. Brown's cabin was half a mile off from the main road that led to Hiram in the same county, Wayne; and that main road at a point opposite Brown's cabin, was two miles from Hiram. Hiram was due north of where that main road passed Brown's cabin, and that was a half mile east of that public road; and leading from that cabin, or near there, was a dim path which intersected the public road. This intersection of public road by dim path occurred half a mile from Brown's cabin, so that cabin was about two and one-half mile southeast of Hiram. This dim path, Brown, Richardson, Bounds and others, of the immediate vicinity, were accustomed to travel. In March, 1900, Brown was engaged in making ties, three-quarters of a mile from his cabin, and in making them, had the assistance of his brother-in-law, Wm. Grant. Two miles about northward from where Brown and Grant were working, was a cabin which was situate on a hillside about a mile south of Hiram, and some one hundred and twenty-five yards from the road. Timber intervened between the road and the cabin, and rendered the latter difficult to be seen from the road, and in about

twenty to thirty yards, a path ran by the cabin, which was built of green pine poles or logs and covered with boards, and was unoccupied in the month of March, aforesaid. Sometimes, people going from the south, northwards towards Hiram, traveled that path, but usually they traveled the road. Whether this road was the same road which passed within half a mile of Brown's cabin, can not be ascertained from this record. Richardson seems to have been prosperous as a tie-cutter, since, according to his wife's testimony, he had accumulated some $700 in money; $375 in twenty-dollar gold pieces, and one five-dollar gold piece; the rest in greenbacks of large denominations. This money he constantly carried on his person in a yellow or tan leather belt. The fact of Richardson's having a considerable sum of money in gold, Schuller, a neighbor, became acquainted with in December, 1899, because Richardson, being at Schuller' house, during that month, had a little sack which Richardson emptied into Schuller's hands, and which the latter, upon counting, found to be eleven twenty-dollar gold pieces. And on that occasion Schuller also saw Richardson have some twenty-dollar bank bills, say three or four. Subsequently, and during the same month, Schuller "brought a check from the office for him." This check, for $160 to $165, was afterwards cashed by Richardson, as he stated. What office was referred to, does not appear.

The fact that Richardson carried his money in a belt around his person, does not appear to have become known, so far as this record shows, except to Richardson's wife; except also, that according to Mrs. Richardson's testimony, Brown knew that Richardson had money, from the fact that on a previous occasion, the latter offered the former money to go into the hotel and saloon business. But this statement of Brown's knowledge of Richardson's having money is to be further qualified by the testimony of Wm. Grant.

On Tuesday, the twentieth of March, about three o'clock

State v. Brown.

in the afternoon, Richardson came home from his work, and changed his clothes, putting on another suit, a "brown like" one, coat, vest and pants; this suit had a little red stripe in it. He left home about four o'clock, saying he was going to Hiram for some potatoes and sugar and to draw his pay, and walked away in that direction, and had on his person a tan leather belt four inches wide which buckled with a buckle, and contained $700; $375 in gold, all twenty-dollar gold pieces, except one, and the rest mostly in twenty-dollar bills; his wife had seen the money a day or two before that, and counted it, and had seen the belt on her husband that afternoon, as he changed his clothes. This was the last time Mrs. Richardson ever saw her husband alive. About two weeks before the twentieth of March, Richardson had spoken generally to Schuller about going to the Klondyke; and some weeks before that, had spoken to his wife in a similar way. Richardson arrived in Hiram, drew his pay at the Holliday-Klotz L. & L. Company's store, and bought a peck of potatoes, some sugar, coffee and twenty cents worth of onions. These articles were put up for him by Billy Wammack, the clerk, in a little sack, a rice sack. This, according to Wammack, was about six o'clock, though he does not say he had or used a timepiece. At that time Richardson had on a brown suit of clothes, with his pants in his boot tops. As Richardson left the store where he had drawn his pay and made his purchases, he was seen by Dr. Johnson, then living in Hiram; Richardson was then going in the direction of his home. He was dressed, as stated by Dr. Johnson, in a brown suit, with a black hat, and had a sack on his shoulder, apparently weighing about twenty-five pounds, and seemingly containing potatoes or something of that kind, and a few packages. This, Dr. Johnson states, was between five and six o'clock; that he judges this was the time, from his usual hour of milking; that it was about sundown. Sundown, as appears from the

World's Almanac for the year 1900, occurred in that latitude, on March 20th, at 6:11.

Corbin was in Hiram at work on a building on the afternoon of March 20, 1900, when Richardson passed by Corbin and conversed with him about the building, how they were getting on, etc.; that this was about 5:30; that Richardson was carrying something in a sack on his shoulder; "looked like he had some apples or something of that kind"; that Richardson was going out home, and that he had on a dark brown suit with a red stripe; coat and pants were alike; don't think he had on a vest.

Sears went within about sixty odd yards of the unoccupied shanty or cabin about 5:30, and saw no indications of a fire there then and passed on his road to Hiram, when he met a man about sixty feet off of the railroad track, coming from the direction of Hiram, a stranger to him, a square-faced man, very nicely dressed; had on a dark suit of clothes, and dark wool hat. Sears bade him good evening, when the stranger replied, "It's pretty cool this evening," and passed on; that as the stranger passed him, Sears noticed a dark red stripe in his coat; that he was carrying a tow sack apparently containing potatoes or something like that. This was about a quarter to six o'clock in the evening, and half or three-quarters of a mile from Hiram. Sears reached Hiram, and left there about a quarter past seven o'clock, and then went back home, and the shanty was burning up when he went by it, and the roof had fallen in.

If the stranger Sears met was Richardson, then as the unoccupied shanty was about one mile from Hiram, Richardson was within half to a quarter of a mile of that shanty when Sears passed him. Richardson did not return home that evening, and never after was seen alive.

The defendant is not represented in this court, but owing to the gravity of the accusation lodged against him, we have, in performance of our statutory duty, carefully read the rec-

ord; and such reading was the more necessary because the first ground set forth in the motion for a new trial in effect asserts that the verdict is unsupported by the evidence.

The testimony of William Grant, the accomplice of defendant Brown, in substance and effect shows he is brother-in-law of Brown, and that about the twentieth of March, 1900, he lived with Brown, who married his sister, near Lowndes and Hiram, about two and one-half miles from the latter place; that he is a single man about twenty-one years old; that he knew George L. Richardson by the name of "George," who lived just a little ways from Brown's; had known him about two months; that he saw him on twentieth of March, 1900, about two o'clock in the afternoon, and at about 5:30 o'clock on the same afternoon, which was the last time he saw him alive, and that Richardson was then about three-quarters of a mile south of Hiram, and near a cabin that was afterwards partly burned; that Brown was at that cabin when witness saw Richardson there; that he saw Brown dragging Richardson by the feet into the cabin; that witness, when he saw this, went to the road some fifty yards east of the cabin and sat down there; that he saw Brown gathering some pine and chips and carrying them to the cabin, and shortly after this saw the cabin in a blaze, which came through the top of the cabin, so that witness could see it from where he sat; that shortly after this, Brown came down to the road where he was, in his right hand carrying a belt that was made of yellow leather, had a pocket in it and witness could hear something in it that rattled like money; that then he and Brown went on their road towards home, which was south from the cabin; that when they reached a point south of the cabin, witness told Brown, "You have got us into trouble," but Brown said, "They would never know who done this, and I told him that they would; and we went ahead until we came to where we was working; that was on the road south of this cabin about a mile and a half we was at work and from there we turned

and went out a path that led east from where we was working
to our cabin where we lived. About half a mile east from
where we worked we turned over a road to our right some
twenty-five or thirty steps. Mr. Brown took his belt and put
it under a pine log that had the bark off of it. From there
we went on down the hill and when we got to the turn of
the hill, Mr. Brown gave me the gun and he got a load of
wood and took it up to the house. After we ate supper we
went to bed and that is all that happened that evening;" that
just before he saw Brown dragging Richardson by the feet
into the cabin, witness heard a gun fire twice, witness then
being distant about fifty or one hundred yards. Witness then
proceeded to state how he came to be in that locality at that
time as follows: "Mr. Brown and I, about five o'clock or
shortly before, started to Hiram and on the way Mr. Brown
said he was going to kill Mr. Richardson. I asked him what
his ideas were for such a thing. He told me to get his money
and he asked me if I would help him, and I told him no I
would not. He asked me why and I told him we would get
into trouble if we did such. He told me I had to help him
and unless I did he would kill me too, and I told him rather
than lose my own life I would, and I asked him what he
wanted me to do, and he said we would go on down past this
cabin and wait until Richardson came along and then he would
ask Richardson if he was paid off and then he would tell me
to go a head to Hiram and for me to go on down the road a
short distance and he would turn and go back with him. We
went on down to the road and sat down there. While we
was sitting there three parties passed us. I don't know who
they were. One of them had a gray team; the next one was
riding a bay horse and the next man was walking; he was
coming from toward Hiram and we took him for Richardson
and we started toward the road and as he drew closer to the
road we saw this man wasn't Mr. Richardson, and the next
man that came along was Mr. Richardson; we met him and

asked him if he got his money and he says 'yes, sir.' Mr.
Brown says 'you go a head to Hiram and I will go back with
the old man.   I started on as if I was going to Hiram and
then I retraced my steps and when I got up to within about
fifty yards of this cabin I heard a gun fire twice and then I
walked ahead until I came to this cabin."   That witness and
Brown were not at that cabin any more that evening; that
next morning we got up and it wasn't quite daylight and Mr.
Brown told his wife he would go to the store that morning;
on the way to the store Mr. Brown told me he was going to
finish burning those remains that day; the remains of Mr.
Richardson.   We walked down past this cabin.   It was be-
tween six and seven o'clock.   When we got to the cabin, we
stepped in side.   To the right of the door as I stepped in laid
Mr. Richardson; his legs were burned off about this far (indi-
cating) above his knees and his arms were burned off.   His
nose and ears were burned off and his face was considerably
burned but he could be recognized by one that knew him.
When we stepped in Brown says, "aint this a hell of a car-
cass?" and I turned sick and almost fainted.   Mr. Brown
picked his body up in his arms and carried it across the road
into the hollow where a tree had blown up and left a hole in
the ground and there he put Mr. Richardson and then he raked
some leaves over his body and then he turned around to the
left and hid a pair of gloves under a pine stump.   We went
ahead to the store and drew our money and also got some
groceries and meat, and we then walked back to where we had
been at work the day before, and I helped him cut a tie tree
and then I went ahead to our house and took the groceries
that we got there.   About ten o'clock Mr. Brown came home
and told me he was going to Greenville, and also told me he
was going to finish burning this body and he changed his
clothes and left. That on Tuesday (the day, it seems, the kil-
ling of Richardson occurred) Brown had on a pair of black cor-
duroy pants, a coat made of brown ducking, and also had on a

shirt; that on Wednesday morning, Brown had on the same clothes; that Brown did not have on his coat on Tuesday, but he did have it on when he carried the body, and after he had done so, put the gloves in a hollow stump that was burned down to a level with the ground, and this stump was between where Brown put the body the last time, and the road. That when Brown reached home on Wednesday morning, after returning from Hiram, he took off his clothes that he had been wearing on Tuesday and since, and put them in a tub of water, which water witness and Brown carried up from the spring; that after Brown put the clothes in the tub, and water had been poured over them, he and Brown ate dinner; that on Tuesday, when the shooting of Richardson occurred, Brown had with him a 38 Winchester rifle; that when witness heard the gun fire twice it sounded like it was right in front of the cabin; that when Richardson was being dragged into the cabin by Brown, witness observed some blood on the forehead of the deceased; that the next morning (Wednesday) as witness and Brown went by the cabin, witness could easily recognize that the corpse was that of Richardson; that this cabin was three-fourths of a mile from Hiram; that witness worked all day Tuesday, tie-making, but Brown went on to Hiram and was gone about three quarters of an hour, and the place at which they were working was about two and one-half miles from Hiram, about one-half mile from where Brown lived, and this place where they were working was about two miles from the cabin where the tragedy occurred; that Brown had a gun in the woods that day, but did not take it out in the morning, but took it out with him in the afternoon after they had been home and gotten their dinner; that Brown had gone to Hiram that day to draw his pay but failed to do so; that after they had eaten their dinner, Brown and witness returned to the woods to their work, and they worked on till about five o'clock, or something near that time; that they had

left home, having eaten their dinner, about one o'clock;·that when they left, Richardson was at or near Brown's house, talking to Bounds, and stated he was going to Camp 19; that after leaving home and returning to their place of work, where they were making ties, Richardson came by there about two o'clock, that place was on the road or in.the direction of Hiram; Richardson staid there twenty-five minutes, and then went on his way towards Hiram; that Richardson, in going there, could go by the cabin or by the road which ran about fifty yards from the cabin; that Brown and witness started on the road towards Hiram about five o'clock, and when they had gone about a mile, then Brown mentioned his intention of killing Richardson, as already stated; that they went on by the cabin, within some twenty steps, and went beyond the cabin some one hundred yards; there they sat down and waited something like a half hour and kept silent; it was then about 5:30 o'clock, and they were in sight of and within about twenty or thirty feet of the road, and they saw a man drive by with a team; but he did not see them, because they watched him to see he did not; then a man rode by on a horse, he was going towards Hiram (which was to the south), but he did not raise his head; then they saw another man, whom they thought to be Richardson, but when he was in about ten or fifteen steps, saw it was a man with dark complexion and moustache; that in about five or ten minutes after this man passed, Richardson himself came along from the direction of Hiram, and they went towards him, met him and spoke to him, when Brown told witness to go on to Hiram, and he would go back with the old man, and so witness started on north towards Hiram, and Brown and Richardson started on toward, or in the direction of the cabin; when witness had gone north some fifteen or twenty steps, he turned and followed at a slow pace in the direction Brown and Richardson had gone, but did not see them, owing to the facts that they were walking fast and he slow, and that the path was through an oak and pine forest,

and besides there was a rise in the ground; then witness heard the gun fire, and then he walked on in front of the cabin, and Brown was dragging Richardson into the cabin, and then witness went back to the road, about fifty yards distant and sat down and waited, Brown, having set the cabin afire, rejoined witness, and they went on home, and when Brown and witness were going on there, witness told Brown what the consequences would be, but Brown said, "no one would ever find it out." Witness then repeated his former statement that Brown told him, that he (Brown) would kill Richardson, put him into the cabin, and burn him up. That they arrived at Brown's house just about dusk; that when they got home, they ate supper and went to bed but witness did not sleep any; that he and Brown got up before daylight, ate their breakfasts, left the house about half past five, and returned to the cabin, as before stated, saw the corpse of Richardson, and recognized his face; Brown had on a coat at the time, and reached down and lifted up the charred, naked, blackened and greasy trunk in his arms; that the face of the corpse was greasy, also, but not charred, and walked off with it, and placed it in the hole where a tree had blown up, about half a mile away. That witness and Brown then went on to Hiram, reaching there about six o'clock, and went into a store, staid until Brown drew his money, bought some produce, when they started back the way they came, down the railroad track until they reached the point where they had been making ties and there witness helped Brown cut down a tree, and then witness took the groceries and went down to the house, Brown remaining behind, and Brown came down to the house about ten o'clock, and then told witness he was going to finish burning the body; there was some grease on the sleeves of Brown's coat, and some on the front of his pants. That Brown told witness he had taken the money out of the belt; that on the evening they met Richardson the latter had a sack on his back.

This testimony of Grant, if believed by the jury, was

abundantly sufficient, although he was a self-confessed accomplice, to convict Brown of the murder charged, even without corroboration; but there was corroboration in this case, as will presently appear, and an appropriate cautionary instruction was given the jury with regard to the testimony of an accomplice.

The testimony of Grant that Richardson was murdered by Brown, and in the manner and at the time and place he testifies it occurred, is corroborated by other testimony and by other evidence in many points and particulars, to-wit: Reading over very carefully the testimony of Grant, and comparing it with the testimony of Sears, and with that of Wammack and Dr. Johnson, it would seem to bring Richardson in the vicinity of the cabin or shanty a little before or a little after six o'clock. Grant, who appears to be not very bright, states he and Brown started from their place of work at or a little before five o'clock, and went towards the cabin, which was two miles distant. Walking, even at the quite rapid gait of a mile in fifteen minutes, would have required thirty minutes in which to have reached the shanty; that they waited near the road for half an hour, and it would seem that Richardson did not make his appearance even at quite the expiration of the half hour of their waiting; that some few minutes elapsed before Richardson appeared. If the stranger that Sears met was Richardson, then Richardson would have overcome the distance intervening between the point at the railroad track and the cabin, a distance of one-fourth to one-half mile, going, as Sears said, at a moderate gait, in from four to ten minutes. So that Grant is corroborated as to the time, as nearly as such things can be ascertained, when Brown and Grant met Richardson. He is also corroborated as to the fact that the cabin was set afire, by Sears, who going within about sixty yards, at say, 5:30, as he went towards Hiram, saw on

Vol 168 mo—30.

his return from Hiram between seven and eight o'clock, the cabin in a blaze, and the roof burning off.

Grant's testimony that Richardson had a sack on his back or shoulder, is corroborated by the testimony of Billy Wammack, who sold Richardson the provisions; by Dr. Johnson who saw Richardson going in the direction of his home with a sack on his shoulder. apparently containing potatoes, etc.; by Sears who met a stranger, with a red stripe in his dark brown coat and a sack on his shoulder, in which there seemed to be potatoes; Grant is also corroborated by the testimony of Mc-, Clure, who stated that about six o'clock, when a mile and a quarter from Hiram, he heard two shots, which followed each other pretty closely, that is three or four seconds apart, though in what direction the shots were, he could not tell. On this point, Forbush, who lived about a mile and a quarter from the unoccupied shanty, is more explicit; for he testified that about six o'clock on Tuesday evening, he heard two shots fired from a 38 or 44 Winchester or similar rifle in the vicinity and direction of the shanty; the one shot giving forth a rather dead sound, and the other ringing clear. It was shown in evidence that on the Tuesday in question Brown carried a 38-caliber Winchester, a magazine gun.

And Grant is further corroborated by other witnesses, who lived in three-quarters of a mile to a mile and a quarter from the burning shanty, that they smelt on that Tuesday night a smell as if of burning rags.

But Grant's story is more strongly confirmed that Richardson was murdered and burned up in the shanty before mentioned, by the following facts: Richardson being missing from Tuesday evening when he was expected home from Hiram, with the provisions he had gone there to buy, and nothing being heard from him, during Wednesday, search was instituted for him by his friends and neighbors on Thursday morning, the men starting northward toward Hiram, from the vicinity of Richardson's little cabin of poles, and scattering out through

the woods, as such searchers are accustomed to do, some of them finally reached the unoccupied shanty above described, and looking into its open doorway, gave a loud halloo, which speedily brought all their associates within ear-shot to the same spot. Within the shanty, the roof of which had been burned off and the logs charred by recent fire, there were a plenty of ashes on the dirt floor, and on those ashes were two footprints. These tracks it seems were not disturbed, but left as they were until the coroner, Mr. Davis, came and measured them; the longer shoe track was shown to be thirteen inches, and the other eleven. The first measurement corresponded exactly with the length of Brown's shoe, which, against Brown's will, the coroner measured. Raking among the ashes, the searchers discovered these things: a potato, burned clear through, but readily recognizable as belonging to the class of edible roots discovered by Sir Walter Raleigh; an onion badly burned, but still easily distinguishable by its own unmistakable and immutable odor, a broken "whetrock," as it is termed, shown by Richardson's wife to have belonged to her husband, and which she stated he always carried in his coat pocket; a part of a burned memorandum book, which she said resembled the one her husband owned and carried and had with him when he started away; some coat buttons (metal) from which the cloth had been burned, and which the wife testified seemed to be of the same size of the cloth-covered buttons that were on her husband's coat; some small pieces of broken bones, and also a considerable portion of the humerus, or arm bone of a man, and of the human ankle bone, as Dr. Johnson pronounced them to be (though Dr. Davis, the coroner, did not seem to be satisfied they were, although he may have seen only the small pieces of bone, and not the ones referred to), and last, but not least, buried in the ashes was found a piece of blood-soaked brown cloth, about the size of the crown of a man's hat, somewhat scorched, but still bearing in its warp and woof "*a small red stripe,*" which Richardson's

wife testified was "*exactly like*" the suit of clothes her husband wore away on the fatal Tuesday. On the log doorsill of the shanty there was a considerable splotch of what seemed to be blood, and a like one on the ground near the doorway of the shanty.

The searchers going southward from the cabin found some ashes scattered a little distance, and in the same direction found a small piece of flesh and a small piece of bone. On the next day, renewing their search, those engaged in it, discovered about a half mile southwardly from the cabin, on a steep hillside, and in a very rough and untraveled country, at a point where a tree had been blown up, a hole some four or five feet long by about three or four feet wide, the remains of the trunk of a human body, the skull all gone except a small piece of bone about four inches square, the limbs all burned away; a little of the skin left intact on the thighs; some of the ribs left adhering to the dorsal column; the hole in the ground having been filled in with rock and the trunk placed there, and a great fire made thereon, with pine poles (remnants of which were scattered around); a fire so great that it split many of the rocks with which the earth-cavity had been filed. Near by were found the gloves of Brown, just in the locality Grant testifies they were placed by Brown on Wednesday morning the twenty-first of March. These gloves when found were covered with blood, grease and flesh, and had the same odor on them that was on the headless and limbless body found in the cavity of the up-blown tree, but a short distance away.

Grant is also corroborated in other ways: Bounds, who lived in the little cabin about twenty-five yards from Brown's, testified that on Tuesday evening, the twentieth of March, Brown did not reach home until some time after dark that evening; that he heard his voice outside; that Brown threw down something like some one throwing down an armful of wood; that about that time a man came into the cabin to get

a lantern to go outside; that after Brown was held over at the coroner's office, he had some talk with him there; Brown asked him if he knew what time he (Brown) came in, when Bounds replied that he thought he heard Brown speak to some one after dark, when Brown replied, it was not dark; and to this Bounds answered, it was dark in the house where he was. Continuing his statement, Bounds said, that on the next day (which was Wednesday, the twenty-first of March), Brown came home about eleven o'clock in the morning, had on a ducking coat with a dark rolling velvet collar and a pair of black corduroy pants; witness was then in his own cabin, and was looking out the hole which served for a window, from which a corner of a tow sack which covered it had fallen down so he could readily see what was going on outside; that Brown changed his clothes and brought the ones he had on, coat, pants, shirt and socks, and put them into a tub, and he and Grant got water from the branch and poured over them, and then Brown put soap on them and washed out his pants leaving them in the tub, and then washed the sleeves of his coat which was also in the tub, and then laid the coat on a log by the tub, and the water from them appeared to be of a dirty red cast; that Brown in about an hour and a half left, saying he was going to Greenville, but before he left, asked witness, who meanwhile had stepped out of his cabin, if he did not wish him to bring him some whisky, as he was going to town; that witness joined in the search, but went no farther than the shanty; that when Brown came home from Greenville Thursday evening, Bounds told him about the search that had been made; the shanty burned, and that it looked like a body had been burned there, and that it looked like some one had murdered Richardson, when Brown spoke up and said, "do you know it *was* Richardson?" and witness said he couldn't swear it, but thought it was.    Bounds also mentioned in his testimony about having been down to the shanty along with other searchers, relating similar facts to what they did, and

also said that when he looked into the shanty, which he did not enter, "it looked like some one had moved some one."

Mrs. Richardson supports Bounds' statement as to the time Brown got home on Tuesday evening, March 20th, when her husband was first missing; she stated that Brown reached home about eight o'clock that evening; that the lamp was burning; she then relates a similar story to that of Brown putting his clothes in the tub, putting soap on them, leaving them there in the tub, and that Brown's wife and a girl wrung them out in the evening after Brown had left for Greenville; that on Brown's arrival at home on that Tuesday evening, she asked him if he had seen or heard anything of her husband, when Brown replied: "He's gone to the Klondyke;" and on the next day, when Brown returned about eleven o'clock from Hiram, whither he had gone early on Wednesday morning, she again asked him if he had seen or heard anything of her husband, when he replied that Richardson had drawn his pay, and that "He's gone to the Klondyke, and there's no use hunting for him."

Grant is further corroborated on the point that Brown left where they were at work on Tuesday afternoon to go to Hiram, left and returned in about three quarters of an hour; a witness testifies to seeing Brown come into Hiram, go to the company's store, and leave in the direction of home, about three o'clock. Still additional corroboration is furnished to Grant's story by the testimony of McClure, who knew Brown well, and who was clerking in the company's store at Hiram on Wednesday morning the twenty-first of March; that it was not quite six o'clock, as witness thought, and witness had on his coat and was sitting down by the heating stove, when Brown came in in his shirt sleeves, had on vest, passed by witness and leaned on the counter a few feet away. Witness then asked Brown if he had seen anything of the missing man, when Brown made no reply, but walked to the other side of the store, when witness repeated his question, at the same time

starting towards Brown, when Brown looked back over his shoulder as he saw witness approaching him, still made no reply, but walked out of the store. Witness further stated that Brown came within three or four feet of him; that "It seemed to me I got a peculiar scent the moment he started to walk to the other side of the room. I noticed that scent the next day; it was at the shanty."

Again, it does not appear that any one knew but Richardson's wife that her husband wore a money belt around him; but Grant testified that Brown took from Richardson's body such a belt, with something in it that "rattled like money." Where could he have obtained that information about the belt, except on the theory that his testimony *is true*?

I have pored over many a criminal record in this court in my time, and I can frankly say that I have never read circumstantial evidence so strongly pointing towards the guilt of any one, nor which so cogently corroborates the testimony of an accomplice as this does that of Grant; it indeed furnishes:

> "* * * Confirmation strong
> As proofs of Holy writ."

If the traverse jury had not found defendant guilty upon the charge preferred, it is difficult to imagine a case where circumstantial evidence, abundantly corroborating positive and direct testimony, would be sufficient to warrant any murderer's conviction.

5. Nor is the fact to be lightly considered, though this seems to have been done by an omission of it in the State's brief, the nature of the reply that Brown made to Richardson's wife when she again asked him about her husband on Wednesday morning, that "He's gone to the Klondyke, and it's no use hunting him." This was, considering the circumstances of this case, a suspicion-generating answer, one pregnant with weighty inference, because it is a very common ruse for one who has perpetrated murder to resort to fabrications of this

sort, as to the reason of the missing person's disappearance; that he has "gone to a distance," thereby seeking to escape detection, and divert suspicion from the scene of the crime and the real criminal.    [Burrill, Circ. Evid., 430, and cas. cit.; Com. v. Goodwin, 14 Gray 55; State v. Dickson, 78 Mo. loc. cit. 448, 449; People v. Arnold, 43 Mich. loc. cit. 305, and cas. cit.]

It is true that defendant in his testimony asserted that Richardson, on the afternoon of the day of his disappearance, over at his house, in his (Brown's) presence, and the presence of his (Richardson's) wife, declared his intention of going to the Klondyke, but this statement of Brown's was emphatically denied by Mrs. Richardson; and it was for the jury to say whom they would believe.

6.    In intimate connection with the topic just touched upon is the admission of the testimony of the coroner, Dr. Davis, to the effect that defendant manifested repugnance or protested against having his shoe measured.    Such testimony, that is, as to the manner and demeanor of a person accused of crime, is always admissible in evidence.    [People v. Arnold, supra; People v. Ah Yute, 53 Cal. 613; 1 Whart. Crim. Evid. (9 Ed.), sec. 751.]    But testimony of this sort is not to be regarded as entitled to much weight, since the manner or demeanor of persons accused of crime varies with the temperament and idiosyncrasies of different individuals.    But even had the evidence been erroneously admitted, the ground of exception to such evidence was invalid; *"incompetent and immaterial."*    [Tygard v. Falor, 163 Mo. l. c., 244, and other cas.]

7.    All acts of the accused are admissible in evidence from which inferences of guilt may be drawn, such as the removal from the person or clothing, stains of blood or other marks, tending to show complicity in a crime.    [3 Rice on Evid., 221.]

8. Belonging to the same incriminatory character are attempts to conceal death by destruction of human remains. [Ibid.]

9. As to the instructions, they are such as are customarily given in prosecutions of this character, certainly the defendant has no cause to complain of them; and as to the point made in the motion for a new trial, that the court did not instruct the jury on all questions of law, etc., it suffices to say that no exception was saved *at the time* the instructions were given on the part of the State; and this was the time when such exception should have been saved. [State v. Cantlin, 118 Mo. 100; State v. Meadows, 156 Mo. 110; State v. Waters, 156 Mo. 132.] But even if such an exception had been saved in time, it would have availed defendant nothing in this instance, because the jury were fully instructed.

10. An instruction was asked by defendant, and refused by the court, which reads this way: "The jury are instructed that when the evidence fails to show any probable motive to commit the crime charged, on the part of the accused, this is a circumstance in favor of his innocence, and in this case, if the jury find, upon careful examination of all the evidence, that it fails to show any probable motive, on the part of the accused, to commit the crime charged against him, then this is a circumstance which the jury ought to consider in connection with all the other evidence in the case, in making up their verdict."

This instruction was properly refused, because a man is not to be acquitted of crime simply because his motive for perpetrating it can not be discovered. [State v. David, 131 Mo. loc. cit. 397, and subseq. cas.]

But in this case there was abundant evidence of motive, that of obtaining the money of the deceased, and if the jury believed the testimony of Grant, the accomplice, they were bound to believe a motive existed for the commission of the

crime, and that defendant committed it; and if they did not believe Grant's testimony as to the commission of the crime by defendant, they were bound to acquit him; so that it is not seen that in any event defendant was prejudiced by the refusal of the instruction.

11. There was no error in refusing the admission in evidence of the letter from some one in Texas addressed to Richardson, and which his wife received and opened after his disappearance, in regard to large wages being paid in the Klondyke, inasmuch as that letter, arriving after Richardson's departure, could not possibly have influenced or caused such departure.

12. Two other grounds for new trial are these: "Because the court erred in admitting irrelevant and incompetent testimony on part of the State over the objections of the defendant.

"Because the court erred in rejecting legal, competent and relevant testimony offered by the defendant."

These grounds are too general. [State v. David, 159 Mo. loc. cit. 534, 535.]

13. The last ground urged for new trial is that the prosecuting attorney was permitted to make improper remarks in his closing argument to the jury. This statement in the motion is, however, no evidence of that statement, as has been many times decided by this court.

14. But the endeavor has been made to supply evidence of the alleged fact, aforesaid, by sending up to this court what is termed a "supplemental bill of exceptions," filed by defendant's counsel in the case, on the twenty-first day of March, 1902, in vacation, long after the original bill had been filed, and the time for filing such original bill had expired, and without notice to, or consent of, the adverse party. This alleged bill was signed by the judge, but of course we can not notice it. A bill of exceptions having become a part of the record, may be amended just like any other portion of the record, by taking the usual course in such matters (Darrier v. Dar-

rier, 58 Mo. 222), but such a thing as a "supplemental bill of exceptions," is unknown to our practice.

We therefore affirm the judgment and direct that the sentence pronounced by the law be executed. All concur.