**STATE of Missouri, Respondent,**

v.

**Jerome DOWNS, Appellant.**

No. 61431.

Supreme Court of Missouri, Division No. 1.

Feb. 11, 1980.

David M. Johnson, Hayes & Heisler, Clayton, for appellant.

John Ashcroft, Atty. Gen., Jerry Short, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT R. WELBORN, Commissioner.

Appeal from judgment and sentence to three consecutive terms of life imprisonment (without possibility of parole for first 50 years of each sentence), entered upon jury verdict finding Jerome Downs guilty on three counts of capital murder. §§ 565.-001, 565.008.1, RSMo 1978.

Oscar Green, Sr., and his wife, Shirley Ruth, owned and operated a store at 6508 Pasadena in Pine Lawn, St. Louis County. The Greens and their four children lived in a residence above the store. On January 27, 1978, at around 1:00 P.M., Oscar Green, Jr., a son, and his sister, Arlene, returned from their classes at St. Louis University. Oscar parked a short distance from the store and when he and his sister went to the doors of the building, two of which led into the store and the other into the living quarters, they found the doors locked. Oscar noticed a "lime green" car in front of the store and heard a voice inside the store say, "Tell 'em we are closed." He heard a voice inside and got a vague glimpse of a figure running to the rear of the store.

Oscar and Arlene returned to their car and discussed going for the police. Oscar started the car and as he pulled up in front of the store, he noticed the door to the residence area open. Arlene got out of the car and went toward the door. When she reached the door, she started waving frantically and Oscar drove away toward the police station. When he looked back in the rearview mirror as he drove away, the front of the store was in sight but he did not see Arlene.

At the Pine Lawn police station, Oscar saw Officer Thieme and they returned to the store. Thieme found the doors to the store locked, but the door to the residence area was unlocked. The officer and Oscar entered and went into a storage area. There they found the Greens and Arlene lying on the floor. All had gunshot wounds in the head. The officer could find no sign of life in either of the parents. Arlene was unconscious but was breathing. She was removed to a hospital and died a short time later, without having regained consciousness.

The store area appeared to have been ransacked. The senior Green's billfold was found on the floor, but it contained no money. Some cash that was kept in a concealed place remained in the store. The store was examined for finger prints. Only one latent print, never identified, was found. A ballistics expert concluded that fatal shots had come from either a .357 magnum or a .38 special caliber. The bullets had come from the same weapon.

Lisa Boyd, then around 16 years of age, lived in the neighborhood of the Green store. Around noon on January 27, 1978, Angelo Hughes, a close friend, came by Lisa's, driving a green Buick, and asked if she had seen Willie Hardin, another close friend. She said she had not and asked Angelo why he wanted to see Willie. Angelo said " * * * he had some business to take care of" and left in his car. There was another person in the car but Lisa could not tell if it was a male or female.

At around 5:00 P.M., Willie Hardin appeared at Lisa's. He was intoxicated. He asked Lisa "to be his girl." She refused the request and Willie said " * * * he didn't go around killing people like Angelo." She asked Willie what he was talking about and he said Angelo had killed the Greens. Lisa knew the Greens but had not heard of their killing and she didn't believe Willie. However, after Willie left, she called Angelo and asked if he had killed the Greens. He asked how she knew. Later, Lisa called Angelo about going to a show but he said he was waiting for someone to call him about some money.

The next night, Angelo told Lisa he had some money and asked her to go to a show with him. She declined the invitation. Angelo came by her house and gave her two cartons of cigarettes.

Although Lisa didn't believe Willie and also was scared since Willie and Angelo lived in the same neighborhood, on Thursday, February 2, she told the police of her conversations. The police promptly arrested Willie and Angelo at around noon. According to the arresting officers, Willie broke down and started crying almost immediately. He said, "I did something wrong" and wanted to tell who was with him when the Greens were killed. He told the officers that he, Angelo and Jerome Downs were present and Downs shot the Greens.

Downs was arrested at around 9:00 P.M. on February 2 and taken to the Pine Lawn police station. According to police, Willie and Downs met at the station and Downs said: "Don't tell on me, Willie." Willie responded, "Why don't you tell them the truth, you shot them." Downs became upset, started crying and said: "Don't tell on me, Willie, don't do this to me, don't do this to me." According to Downs, his response to Willie's remark was, "Quit lying on me."

A grand jury indicted Downs on three counts of capital murder. He was tried on an information substituted for the indictment.

At the trial, in addition to testimony by Oscar Green, Jr., investigating and arresting officers and Lisa Boyd, the state of-

fered the testimony of Robert Holman, 15 years of age, that in January, 1978, he had a conversation with Downs, Hardin and Hughes about robbing the Green store. According to Holman, he declined to participate. However, Holman said that, on the day of the robbery, he left his classes at Normandy Junior High School, some distance from the Green store, and went to the playground of the Garfield School, across the street from the store. He saw Downs, Hughes and Hardin go into the store. Then he heard a shot and about a minute and a half later another shot. He saw Arlene at the door, saw her hand go up, then it looked like "she was snatched in" and he heard another shot. Holman ran and saw no one leave the store. He returned to his classes and told no one what he had observed until May 24, when he was in custody on a burglary charge. At that time he told his story to police officers.

Nine-year-old Crystal Ellis testified that she was in class at Garfield School, across the street from the Green store, on the day of the murders. She heard two gunshots and looked out the window and saw two men backing out of the door of the store and getting into a green Buick automobile. She identified a photograph of Hughes' auto as the vehicle she saw. One of the men drove the car away. She never saw a third person.

Hardin, 18 years of age at the time of trial, testified for the state. He testified that, about a week before the occurrence, he, Downs and Hughes discussed robbing the Green store. On January 27, he was walking in the vicinity of the store when Downs and Hughes drove up in Hughes' automobile. Hardin got in, and the robbery was discussed, and Hughes drove to the store, parking across the street. Hughes and Downs got out, telling Hardin to "watch out for 'em," and went into the store. After about 20 minutes, Hardin heard two gunshots. He went to the door to see what had happened and Downs, with a gun in his hand, let him in. Hughes was looking for money. Hardin locked the back door. He saw the Greens' bodies on the floor. Then he saw Arlene, whom he knew,

at the door. Downs told him to open the door and let Arlene in. Hardin opened the door and grabbed Arlene by the arm. Downs helped him pull Arlene into the store. She fell to her knees and begged for her life. Downs put the gun at her head and shot her. After continuing the search for money for about five more minutes, the three left. Angelo dropped Hardin off at his house. Hardin got drunk on wine and went to see Lisa Boyd. He had a .22 caliber pistol when he went to Lisa's, but Downs had the only weapon at the time of the robbery.

The prosecutor told Hardin that if he would testify and tell the truth, the prosecution would recommend a sentence of 15 years in the penitentiary as punishment for his participation in the crime.

Gerald Huston, a penitentiary inmate serving a 13-year burglary sentence, testified that, while he was in the St. Louis County jail awaiting trial, he occupied an isolation cell next to the cell occupied by Downs. He knew about the charges against Downs and asked him whether he had committed the murders. According to Huston, Downs' response was that "he didn't want to talk about it because he could still see the people's faces * * *." A correctional officer employed at the jail testified that she monitored the speakers in the isolation cells at the jail and that she overheard a conversation in which Huston, whose voice she knew, asked "Are you up here for the Pine Lawn killing?" A crying voice responded "No." Huston said, "Why are you crying? You must have did it." The voice responded, "No, no, no, I don't want to talk about it. I can still see their faces." The officer could not identify the responding voice. Records showed that Huston and Downs occupied adjoining isolation cells.

On behalf of the defendant, Kimberly Broyles testified that she was in the Green store at around one o'clock on January 27, 1978. Two black persons came into the store together. She could not identify them. One was wearing a brown leather

coat. The two men and the Greens were in the store when she left. She "knew of" Willie Hardin but didn't know whether he came in the store.

Nineteen-year-old Denise Downs, sister of appellant, testified that her brother was with her in the family residence three blocks from the Green store all day on January 27, 1978. They watched television and played cards with Patricia Brookfield.

Jerome Downs, 21 years old, denied that he committed the murders. He testified that he was home all·day on January 27. He got up at around 10:30 A.M. and did not leave the house until 5:00 P.M. He and his sister and Patricia played cards, talked and watched TV all day. He denied knowing either Willie Hardin or Angelo Hughes but did know Lisa Boyd. He testified that he told interrogating officers that he had been home all day. He denied the officers' testimony that Downs told them that he had been "on·the street" at the time of the murders.

According to Downs, he was told by officers at the Pine Lawn police station that Hardin had accused him of the murders and "* * * for me to wait right here, he will be back. They brought Willie Hardin in the room I was sitting down at and when he said it was all over, man, tell them you shot the people, I jumped up. I told Willie Hardin to quit lying on me."

Downs denied that he had a conversation with Huston at the jail. He had pleaded guilty in 1977 to a charge of possession of marijuana and had been placed on probation for two years.

The defense presented the testimony of Marcella Birckhead, the teacher of the spelling class Robert Holman claimed that he had cut to go to the scene of the crime. She testified that her records showed that Holman had been present in class on January 27 from 12:51 to 1:45. She acknowledged that her records did not show Holman's absence from class during all of the time that he had been suspended from school between February 15 and March 2. She acknowledged that "at times" she was "missing his absenteeism."

The jury returned a verdict finding Downs guilty on each of the three counts of capital murder. The issue of punishment was then submitted and on each count the jury fixed the punishment at life imprisonment without possibility of parole until a minimum of 50 years had been served.

In this court, appellant first attacks the sufficiency of the information upon which he was tried.

Count I of the information read, in part:

"That JEROME DOWNS, in the County of St. Louis, State of Missouri, on or about the 27th day of January, 1978, did wilfully, unlawfully and feloniously, acting with another, knowingly, premeditatedly, deliberately, with malice aforethought did make an assault upon one Oscar Green, Sr., hereinafter referred to as victim, with a certain loaded gun, and then and there with the gun aforesaid, feloniously, wilfully, knowingly, premeditatedly, deliberately and with malice aforethought and with the intent to take the life of Oscar Green, Sr., did shoot at and upon the body of the said victim from which said mortal wound said victim did die on or about January 27, 1978; "

Counts II and III charged the offense with regard to the other two victims. In those counts, following the words " * * * did shoot at and upon the body of said victim * * * " the phrase "thereby feloniously inflicting a mortal wound upon the said victim" appears.

Appellant first attacks the information because it does not contain a "plain, concise and definite statement" of the offense, as required by Rule 24.01(a). His complaint is that the information contains several averments which are not elements of the offense of capital murder, defined in Section 565.001, RSMo 1978, as follows:

"Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder."

Specifically, appellant objects to the use of the language "feloniously," "with malice aforethought" and "with intent to take the life" because none of these elements is included in the statute defining the offense. Although as appellant states, an information charging any offense in the language of the statute is ordinarily sufficient (*State v. Hammond*, 571 S.W.2d 114, 116[2, 3] (Mo. banc 1978)), it does not follow that an information which fails to track precisely the statutory language is insufficient. The fundamental test of the sufficiency of an information is whether or not it states the essential elements of the offense charged so that the defendant is adequately informed of the charge against him and the final disposition of the charge will constitute a bar to further prosecution for the same offense. *State v. Stringer*, 357 Mo. 978, 211 S.W.2d 925, 929[6–10] (1948); *State v. Tandy*, 401 S.W.2d 409, 412–413[2–4] (Mo.1966); *State v. Adams*, 546 S.W.2d 550, 552[5] (Mo.App.1977); *Merrill v. State*, 576 S.W.2d 561, 562[1–3] (Mo.App.1978).

In this case, the information advised the defendant that he was charged with "wilfully, unlawfully * * *, knowingly, premeditatedly, deliberately * *" killing another. Those are the elements of the offense of capital murder as defined by Section 565.001. The added language of which appellant complains is, with the possible exception of the term "feloniously" (see *State v. Barkwell*, 590 S.W.2d 93 (Mo.App.1979)), surplusage. Absent demonstration of prejudice to the defendant, surplusage is disregarded in determining the adequacy of the information. *State v. Sykes*, 436 S.W.2d 32, 35[6, 7] (Mo.1969); *State v. Harley*, 543 S.W.2d 288, 292[5, 6] (Mo.App. 1976); *State v. Pinkus*, 550 S.W.2d 829, 838[22] (Mo.App.1977). No demonstration has been made that appellant was prejudiced by the use of the language complained of. Therefore, the complaint on this basis against the sufficiency of the information is without merit.

Appellant also complains of the omission from Count I of the language "thereby feloniously inflicting a mortal wound upon the said victim." Although appellant argues that the inclusion of such language in Counts II and III and its omission from Count I creates confusion as to the meaning of Counts II and III, such argument has no rational basis and the problem exists only with respect to the sufficiency of Count I because of the absence of such allegation. In *State v. Birks*, 199 Mo. 263, 97 S.W. 578 (1906), an information charging second degree murder in the prolix language of that era was held insufficient for failure to charge that the shooting into the body of the victim, described at length and including the designation of the affected area of the body and the depth and breadth of the wound, gave the victim a "mortal wound" (97 S.W. 581). See also *State v. Brown*, 168 Mo. 449, 68 S.W. 568, 569[1]. The basis of such holdings was the "inflexible rule in criminal pleadings that in all indictments for felonies nothing can be left to intendment or implication." *Brown*.

The most recent application of the holding of those cases appears to have been in *State v. Brooks*, 507 S.W.2d 375 (Mo.1974), cited by appellant. In that case the omission from the indictment was greater than that here involved, the indictment charging that the defendant made an assault upon the victim with a shotgun, " * * * then and there inflicting upon said Robert Kennedy, within one year thereafter, * * *, died." The indictment was held insufficient because it "did not allege that the defendant inflicted a wound on Robert Kennedy from which he died * * *." 507 S.W.2d 376. In this case, the information does charge that appellant shot "upon the body of the victim," an act which in the normal course of events would result in a wounding.

*State v. Stringer*, 357 Mo. 978, 211 S.W.2d 925 (1948), discusses Brown and Birks and other cases holding to similar effect. The holding of those cases was attributed to the requirement of great strictness and technical accuracy imposed by the controlling common-law rules of pleading. 211 S.W.2d 929[6–10]. Stringer involved a manslaughter conviction under an information which

charged that the defendant, by some means unknown, made an assault upon the victim and killed him. In holding that the absence of an allegation that the deceased was given a mortal wound by the defendant was not a fatal defect upon a charge of manslaughter, the court "assumed" that the information, by reason of such omission, could not be good as a charge of murder in the first or second degree. 211 S.W.2d 929[11, 12].

In *State v. Brookshire*, 368 S.W.2d 373 (Mo.1963), a case involving a conviction for second degree murder, *Stringer* was cited as authority for the proposition that "[t]his court * * * long ago departed from the extremely technical requirements of common law indictments and informations." 368 S.W.2d 380. In that case the information charged that the defendant made an assault upon the victim with a pistol and "did shoot, discharge, strike and wound [the victim] and by reason thereof [the victim] did die * * *." The court rejected a challenge to the information based upon the omission of the words "then and there" to connect the assault with the wounding and the failure to charge that the pistol was "loaded with leaden balls." 368 S.W.2d 381.

It would seem that, in any event, Rule 24.01, effective January 1, 1953, clearly rejected the "extremely technical requirements" of the common-law rule. Further, MACH–CR, approved by this court effective January 1, 1979, demonstrated the court's concern for clear and concise statements of criminal charges. Had the prosecutor in this case followed MACH–CR 16.-02, the charge, insofar as the present question is concerned, would have been that the defendant willfully, knowingly, with premeditation, deliberately and unlawfully killed the victim by shooting him, thereby causing him to die. Such is the import of the language in Count I of the information in this case.

In *State v. Kerr*, 531 S.W.2d 536, 539[1, 2] [3] (Mo.App.), the Kansas City Court of Appeals reached that conclusion with respect to an information charging murder in the first degree and which used the language the same as that here under attack, i. e., the defendant made an assault with a .22 caliber revolver, and did "* * * shoot said .22 caliber revolver at and upon the body of [victim], from which said mortal wound [victim] did die * * *." The court found the language sufficient to charge that the victim had sustained a mortal wound inflicted by the defendant's gunshot. See also *State v. Pinkus*, 550 S.W.2d 829, 838[22] (Mo.App.1977).

■ Count I of the information did state the essential elements of the offense of capital murder.

Appellant contends that his motion for judgment of acquittal should have been sustained because the evidence was insufficient to permit the jury to find beyond a reasonable doubt that appellant committed the offenses charged against him.

The first premise of appellant's argument on this score is that the testimony of Robert Holman was so convincingly rebutted by the testimony of his spelling teacher that Holman's testimony may be disregarded in passing upon the sufficiency of the evidence, leaving the testimony of Hardin as the sole support for the conviction. Mrs. Birckhead's testimony did not have such effect. She acknowledged that her testimony to Holman's presence in her class at the time he said he was at the scene of the crimes was based upon her attendance records and she acknowledged the possibility of error in her records. Holman's credibility remained a matter for the jury and his testimony may not be discarded in passing upon the contention of appellant.

Appellant attacks the credibility of Hardin's testimony. As he asserts, Hardin admitted that he had told several different versions of the Green murders. These inconsistencies were explored at length and his credibility remained a matter for the jury. The state's case did not rest upon the uncorroborated testimony of Hardin as an accomplice. The jury also had the testimony of Holman as well as evidence of statements of the appellant which were in the nature of admissions, such as the statement to Hardin at the police station—"Don't tell

on me" and the statement to a fellow prisoner—"I can still see their faces."

The state's witness Ellis testified that she saw two, and not three, persons leave the Greens' store after hearing shots. That is not consistent with Hardin's testimony that he, Hughes and appellant left the store following the shooting of Arlene. Nor was there physical evidence corroboration of Hardin's testimony. Again, however, these matters were not destructive of the state's case and were for the jury to consider and resolve.

 Weighing the evidence is not the function of this court. That is for the jury and the evidence here was sufficient to permit the jury to find beyond a reasonable doubt that appellant was guilty of the offenses charged.

Appellant finally contends that the trial court erred in failing to grant a new trial on the basis of newly discovered evidence. The evidence relied upon was the testimony of Otha Liggins, Jr., a nephew of appellant who, after the trial, had been incarcerated on an unrelated crime in the St. Louis County jail along with Hardin, following the conclusion of appellant's trial in March, 1979. Around April 1, according to Liggins, he engaged Hardin in conversation at the jail and Hardin told him that he had killed the Greens and that appellant was not involved. At the hearing on the motion for new trial, Hardin denied any conversation with Liggins.

In this court, appellant contends that the testimony of Liggins constituted new evidence for which the trial court should have ordered a new trial. Regardless of the appropriate categorization of this claim of error on the part of the trial court (*State v. Harris*, 428 S.W.2d 497, 500[1] (Mo.1968)), the decisive consideration is that the claim was necessarily addressed to the trial court's discretion (*Harris*). The trial court obviously had to pass upon the question of credibility. It saw the witnesses and heard their testimony. The kinship between Liggins and appellant is an obvious factor in this regard.

There has been no demonstration of abuse of discretion on the part of the trial court in denying the motion for new trial on this ground.

Judgment affirmed.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the judges concur.