## THE STATE v. BIRKS, Appellant.

**Division Two, November 20, 1906.**

1. **INFORMATION: No Implication.** In an information or indictment nothing material can be left to intendment or implication.

2. ————: **For Murder: Defective.** An information, attempting to charge murder, which, following the charging of the assault by shooting at deceased with a gun, omits the words, "thereby giving to" deceased "one mortal wound," or other words of similar import—is fatally defective.

3. **EVIDENCE: Physician: Res Gestae: Dying Declarations.** A physician testified, for the State, that he reached deceased about half an hour after the difficulty; that he inquired of deceased if he was suffering much, and deceased replied, "No, doctor, it is a peculiar distress that I have; it is an awful feeling and I can't explain it;" that he then asked deceased if he knew why the man had shot him, and deceased answered, "No, doctor." *Held,* that these statements of deceased were inadmissible, not being dying declarations and not standing in such immediate causal relation to the act as to constitute part of the *res gestae.*

4. ————: **Former Difficulties: Details.** While former difficulties between defendant and deceased are admissible, the details of of such difficulties are inadmissible.

5. **THREATS: Instruction: No Evidence.** Instructions as to threats, communicated and uncommunicated, should not be given where, as in this case, the testimony does not warrant them.

Appeal from Lawrence Circuit Court.—*Hon. F. C. Johnston,* Judge.

REVERSED AND REMANDED.

*McPherson & Hilpirt, R. H. Landrum* and *Peel & Sizer* for appellant.

(1) The court committed error in permitting the witness Dr. Russell to testify to the statement made to him by the deceased, because the same was not part of

the *res gestae* and was not competent.    State v. Hendricks, 172 Mo. 654; State v. Snell, 78 Mo. 240; State v. Feary, 172 Mo. 213.    The statement was not admissible as a dying declaration for the reason the evidence does not show deceased made the same under the belief of impending death and that he was without hope of recovery.    State v. Simon, 50 Mo. 370; State v. Partlow, 90 Mo. 608. And for the further reason that it is not a statement of fact but is an expression of an opinion or rather want of opinion by the deceased. State v. Chambers, 87 Mo. 406; State v. Parker, 96 Mo. 382.    (2)  The information is fatally defective and defendant's motion in arrest of judgment should have been sustained.    In criminal pleading nothing is left to intendment or implication.  State v. Brown, 168 Mo. 449; State v. Rector, 126 Mo. 340; State v. Furgerson, 152 Mo. 92, 162 Mo. 668; State v. Hagan, 164 Mo. 658.

*Herbert S. Hadley,* Attorney-General, *N. T. Gentry,* Assistant Attorney-General, and *D. H. Kemp* for the State.

(1)  No error was committed by the court in admitting in evidence the statement made by the deceased to Dr. Russell.   It was admissible as part of the *res gestae.*  State v. Hudspeth, 150 Mo. 26; State v. Sloan, 47 Mo. 604; State v. Martin, 124 Mo. 524; Irby v. State 25 Tex. App. 213; 3 Wig. on Ev., secs. 1750, 1751.    (2) The information, which was duly verified by the affidavit of the prosecuting attorney of Barry county, is sufficient in form and substance.   State v. Jones, 134 Mo. 259; State v. Privitt, 175 Mo. 224.

FOX, J.—This cause is brought here upon appeal by the defendant from a judgment of conviction in the circuit court of Lawrence county for murder of the second degree.  The information upon which this prosecution is predicated, omitting caption and formal parts, is as follows:

"D. H. Kemp, prosecuting attorney within and for the county of Barry, in the State of Missouri, acting herein under his oath of office and upon his knowledge, information and belief, informs the court, that, Harry Birks, on the 9th day of March, A. D. 1905, at and in the county of Barry and State of Missouri, then and there being, in and upon one Marion Thomas, then and there being, feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did make an assault and with a dangerous and deadly weapon, to-wit, a double-barrel shotgun, then and there loaded with gunpowder and leaden balls, which he, the said Harry Birks, in his hands then and there had and held, at and against him, the said Marion Thomas, then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought did shoot off and discharge, and with the double-barrel shotgun aforesaid, then and there feloniously, wilfully, deliberately, and premeditatedly, on purpose and of his malice aforethought, did shoot and strike him, the said Marion Thomas, in the middle of the right groin of the body of him, the said Marion Thomas, then and there with the dangerous and deadly weapon, to-wit, the double-barrel shotgun aforesaid, and the gunpowder and leaden balls aforesaid, in and upon the right groin of him, the said Marion Thomas, one mortal wound of the breadth of two inches, and of the depth of six inches, of which said mortal wound the said Marion Thomas, from the 9th day of March, 1905, in the county of Barry and State aforesaid, did languish, and languishing did live, on which said 10th day of March, 1905, the said Marion Thomas, in the county of Barry and State of Missouri, of the mortal wound aforesaid, died.

"And so D. H. Kemp, prosecuting attorney aforesaid, upon his oath aforesaid, does inform the court that the said Harry Birks, him, the said Marion Thomas, in the manner and form aforesaid, by means aforesaid, at the time and place aforesaid, feloniously,

wilfully, deliberately, premeditatedly and of his malice aforethought did kill and murder; contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State.''

It will be observed that the killing of Marion Thomas is charged to have occurred in Barry county. The record discloses that upon the defendant's application the venue of said cause, on the ground of the prejudice of the inhabitants of said county, was changed to the circuit court of Lawrence county.

At the November term, 1905, of the Lawrence Circuit Court the defendant was put upon his trial. The State's evidence tended to prove that the deceased and his brother, Houston Thomas, resided on a farm near Monett, and were engaged in the sawmill and threshing machine business. The deceased was a married man and about forty years of age, and his brother was about thirty years old at the time of the homicide. On March 9, 1905, deceased and his brother drove to Monett in a two-horse buggy, reaching there between eleven and twelve o'clock; they tied their team to the public rack and visited various places of business during the afternoon. About six o'clock p. m. they went to the Shaw saloon, where they saw defendant at the farther end of the bar. Deceased and his brother had also seen the defendant near the postoffice an hour or more prior to this time but nothing was said by either one of them at either time. While they were in the Shaw saloon, defendant left the saloon, going out the back door. This saloon was located in the same block and only a short distance from the Sherman saloon, where the final difficulty occurred. After leaving the Shaw saloon, deceased and his brother went to the lumber yard, and from there to the Sherman saloon. The witnesses differ as to the exact time when these two men reached the Sherman saloon, but all agree that it was a little after six, possibly five, ten or fifteen minutes past six. In this saloon, the deceased was stand-

ing next to a screen, Thornton Cox was standing next to deceased, and Houston Thomas was standing next to Thornton Cox; and all three were facing the bar, taking a drink. The saloon faces the east, has double doors in front and near to said doors, and only six or seven feet away, is a screen, made of wood and colored glass. On the north side of the saloon is the bar, and on the east end of the bar out beyond the screen is the cigar stand.. The deceased, his brother and Thornton Cox were west of and behind this screen and near to and facing the bar. A few minutes after Mr. Sherman came on duty in the saloon, the deceased asked him if he had seen defendant, or if he knew where the defendant was. In a moment, the defendant walked into the front of the saloon and around on the south side of this screen; he was carrying a double-barreled shot gun. Defendant had the stock of the gun under his arm, and the barrel was angling out to the front of him and towards the deceased. Defendant said, "What in the hell are you fellows talking about? I understand you are looking for me." Deceased said, "Harry, don't," and raised his hands; at the same time, he walked towards defendant. Defendant stepped back toward the front door and fired at deceased, the load taking effect in the right groin. Deceased fell to the floor, and defendant pointed his gun toward the brother of the deceased; but Sherman jumped over the cigar case and took the gun away from defendant. At the same time, Thornton Cox took hold of deceased's brother and prevented any further trouble. The State's evidence further showed that a little after six o'clock p. m. defendant walked into the Shaw saloon, or Meagher's saloon, carrying a double-barreled shot gun, and asked Mr. Meagher to give him some shells. Mr. Meagher asked where he was going, and defendant said he was going to King's pond next morning duck hunting. Mr. Meagher then gave defendant four loaded shells, and defendant broke down the gun and inserted two of the shells in the breech.

Mr. Meagher objected to defendant loading the gun in there; but defendant did not remove the shells. Defendant left the Meagher saloon, and in less than ten minutes he returned, saying that he had killed a man, and gave Mr. Meagher back two of the shells. Defendant was arrested that evening by officer Jackson, who took defendant to jail; and defendant remarked to the officer that "that was a hell of a way to go duck hunting." At two o'clock that night, officer Jackson received a telephone message that Marion Thomas had died, and told the defendant of that fact the next morning. Defendant said, "I guess I will have to die a little too." The next day, while riding on the train with officer Jackson, defendant stated to John Hornbeck that he wished he had killed Mr. Sherman first and then shot the other two brothers.

A few minutes after the shooting, Dr. Russell was summoned to the saloon, and examined the wounds on deceased, and Dr. Miller was also summoned; and the two decided to move deceased to the Indiana hotel. The physicians testified that they found deceased suffering from a gun-shot wound, which entered the right groin, extending back through the pubic bone and into the rectum. The wound ranged down, to the right and backward, and was very large, having been made by a load of duck shot. As a result of said wound, the physicians testified that the deceased died at one o'clock that night.

The defendant's evidence tended to prove that there was bad feeling existing between the defendant and deceased, and also between the defendant and deceased's brother for some time prior to the final difficulty. That deceased made several threats against the life of defendant, accused defendant of stealing some money from him, saying that he was going to get even with defendant, etc. That on the day of the final difficulty, deceased and his brother made a number of inquiries of different persons in the various saloons of Monett for defendant; and as they were entering the

Shaw saloon, or Meagher's saloon, at six o'clock, they said they wanted to find defendant, and intended to kill him. The person to whom defendant made this statement (John Suttles) told defendant. Defendant went home, got his double-barreled shot gun and went to Meagher's saloon where he borrowed four loaded shells. Defendant told Mr. Meagher that he was going to King's pond duck hunting the next morning, and wanted the shells for that purpose. Mr. Meagher noticed defendant broke the gun in the saloon and put in two shells; whereupon Mr. Meagher objected to his loading it in there. Defendant went out towards a friend's house, with whom he intended to stay all night; and, as he passed the Sherman saloon, he concluded he would go in there and take a drink. As he entered the saloon, he heard deceased talking to some one about getting an affidavit to the effect that defendant was dishonest; whereupon defendant walked around the screen and said: "What in the hell are you fellows talking about? I understood you are looking for me." Deceased, his brother and Thornton Cox all turned around, and deceased raised his left hand and started towards defendant. Defendant called to deceased three times and told him to stop; but deceased continued to advance, and made a motion as if to get his pistol, when defendant fired his gun. Deceased fell and Mr. Sherman jumped over the cigar case and took the gun away from defendant. Defendant went to Mr. Meagher's saloon, returned the shells, told that he had killed a man, and wanted to surrender to officer Jackson. Defendant denied making the statement as testified to by officer Jackson and State's witness, John Hornbeck; and said that he did not shoot deceased till the latter had crowded defendant into the corner and was about to take hold of his (defendant's) gun barrel. Defendant's evidence further tended to prove that a pistol was found on deceased, which pistol had been given to him a few minutes before the shooting by deceased's brother. There was evidence to the

effect that the deceased's reputation, when drinking, was bad; but that he had a good reputation when sober; and that on this afternoon deceased and his brother were both badly intoxicated.

In rebuttal the State offered testimony tending to prove that the deceased's general reputation was good; and also that a few minutes before six o'clock deceased and his brother were not under the influence of liquor.

At the close of the testimony the court instructed the jury upon murder in the first and second degrees and upon the subject of reasonable doubt, self-defense and other general instructions covering the testimony introduced in the case. Defendant requested the court to give a number of instructions which were refused. We deem it unnecessary to burden this opinion with a reproduction of the instructions given or those refused. We will refer to them during the course of the opinion.

The cause was submitted to the jury upon the evidence and the instructions of the court and they returned a verdict finding the defendant guilty of murder in the second degree and assessing his punishment at imprisonment in the penitentiary for a term of forty years. Timely motions for new trial and in arrest of judgment were filed and by the court overruled. The court caused the sentence and judgment in conformity to the verdict to be entered of record, and from this judgment the defendant in proper time and form prosecuted his appeal to this court, and the record is now before us for consideration.

### OPINION.

This record discloses numerous assignments of error; however, it is apparent that the most important proposition presented to our consideration upon this appeal is the challenge to the sufficiency of the information filed in this cause. In order to support this

judgment of conviction it is clear that it must have a valid information properly charging the offence upon which to rest; therefore, it is well at the very inception of the consideration of the proposition involved as disclosed by the record, to first determine whether or not the defendant has been properly charged upon the information of the prosecuting attorney with the offense for which he was convicted.

It is a fundamental rule in criminal pleading that in all indictments for felonies nothing material shall shall be taken by intendment or implication.    In State v. Furgerson, 152 Mo. 92, BURGESS, J., speaking for this court, gave full recognition to this rule and quoted approvingly from 2 Hawkins, P. C., chap. 25, sec. 60, where it is said: "In an indictment nothing material should be taken by intendment or implication."

A careful examination of the information upon which this prosecution is based makes it manifest that it is insufficient to support the judgment.    It fails to charge that Marion Thomas was given a mortal wound by reason of the alleged assault upon him with the gun. In other words, following the charging of the assault by shooting at said Thomas with a gun, the words "thereby giving to him, the said Marion Thomas, one mortal wound," or words of similar import, are entirely omitted, leaving the charge without any connection between the shooting at the deceased with the gun and the infliction of the mortal wound.    This information is substantially in the same form as the first count of the indictment in the case of State v. Brown, 168 Mo. 449; and so far as the omission of essential allegations are concerned, as is herein indicated in the information in the case at bar, it is identical with that pointed out in the case of State v. Brown, supra. SHERWOOD, J., speaking for the court in that case, said: "The first count is bad because of lacking the words 'thereby giving to him the said George L. Richardson' or words of similar import. Lacking these words, this count does

not directly charge that George L. Richardson was 'given' a mortal wound. It is the inflexible rule in criminal pleadings that in all indictments for felonies, nothing can be left to intendment or implication.''

The principle announced in the case last cited was fully concurred in by this entire division, and has been uniformly approved by this court. [State v. Furgerson, supra; State v. Hagan, 164 Mo. l. c. 658; State v. Williams, 184 Mo. 261; State v. Woodward, 191 Mo. 617.]

In support of the sufficiency of this information our attention is directed to the case of State v. Jones, 134 Mo. 254. It is true that the indictment as copied in the report of that case omits the essential allegation as pointed out in the case of State v. Brown; however, we now have the original transcript before us in which is contained the indictment as certified by the clerk of the trial court, and an examination of it shows that the indictment which was in judgment before this court did not in fact omit the essential allegations which are pointed out in the Brown case and in the case at bar, and such indictment contains the essential allegations which were omitted in the case of State v. Brown as well as in the case at bar, and is in strict conformity with the uniform rules of this court; therefore, it is apparent that the indictment presented to this court for consideration in the Jones case sufficiently and correctly charged the offense, and the error was not that of the court, but simply consists of an error in printing the indictment which was actually passed upon by this court. The question involved in the Brown case and in the case at bar was not discussed in the Jones case, and there was no reason for discussing it because the indictment before the court strictly conformed to the rules of pleading in criminal cases. Doubtless the erroneous copy of the indictment in the Jones case misled the prosecuting attorney in filing the information in the case at bar. However, it is clear

that even though he was misled, such fact can furnish no valid reason for holding this information valid, when it is so manifest that it is insufficient under the well-recognized rules of pleading in criminal cases. The case of State v. Brown clearly announced the correct rule, and the principle announced has been uniformly followed and approved by this court, and the ruling in that case must be regarded as decisive of the question as to the sufficiency of the information in the case at bar. It therefore must be ruled that by reason of the omission of the essential allegations as herein pointed out the information in this cause is insufficient to support the judgment. This cause, for the fatal defect in the information, must be remanded for a new trial.

We are unable to forecast with any degree of certainty what will be the testimony upon such retrial of this cause; however, as it is to be re-tried it may be well to briefly suggest our views upon some of the remaining complaints presented by this record.

## I.

Complaint is made by the appellant that the court erroneously admitted in evidence the statements made by the deceased to Dr. Russell. It is sufficient to say upon this complaint that we have carefully considered the disclosures of the record upon this subject. It appears that Dr. Russell was sent for to attend the deceased after he was · shot and that he reached him in the saloon where the shooting occurred. Dr. Russell says that it was about a half hour after the difficulty; however, Mr. Sherman thought it was only ten or fifteen minutes. Dr. Russell first inquired of the deceased if he was suffering very much and the deceased replied, ''No, doctor, it is a peculiar distress that I have; it is an awful feeling and I can't explain it. It is not exactly pain.'' ''Then I asked him if he knew why the man had shot him and he replied, 'No, doctor.' ''

199 Sup.—18

While it may be that the fact that the deceased did not undertake to detail any of the circumstances of the difficulty and simply answered that he did not know a fact which was peculiarly within the knowledge of the defendant himself, that is, that he did not know why the man had shot him, would not be such error as to warrant the reversal of this judgment, yet manifestly it was erroneous under the circumstances disclosed by the record to admit any conversation between the doctor and the deceased. Such statements by the deceased to the doctor were not part of the *res gestae.* They amounted to nothing more than an ordinary conversation between a doctor and his patient. These statements did not stand in such immediate causal relation to the act as would constitute them a part of the *res gestae.* Dr. Wharton, in defining the *res gestae,* says that it "may be defined as those circumstances which are the automatic and undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist, as we will see, of sayings and doings of any one absorbed in the event, whether participant or bystander; they may comprise things left undone as well as things done. . . . In other words, they must stand in immediate causal relation to the act, a relation not-broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself." [1 Whart., Law of Ev., sec. 259.]

The testimony of the doctor in the saloon and after the deceased was removed from the saloon over to the hotel as to his examination of him and what he observed as to the nature and character of the wound, was competent, but any statements made to the doctor by the deceased, it not appearing that they came within that class of testimony known as dying declarations, were clearly incompetent and should have been promptly excluded by the court.

## II.

It is insisted by appellant that the court committed error in excluding evidence of former difficulties between the deceased and the defendant. It is only necessary to say upon this proposition, that so far as regards any details of former difficulties, they were inadmissible. It was competent to show the fact that there had been previous difficulties, and if the defendant made any threats of violence against the deceased, it is competent to prove such threats, but to go into the details of former difficulties would simply tend to confuse and mislead the jury, and in many instances direct their attention to the consideration of the question as to who was in the right or wrong in such previous difficulties, concerning which there is no one upon trial.

## III.

Numerous complaints are insisted upon by appellant respecting the instructions given as well as those refused. We repeat that this court is unable to determine what changes may be made in the testimony upon the retrial, or what additional testimony may be introduced; therefore, it is sufficient to merely suggest that precedents of approved instructions in cases of this character are numerous, and we assume that upon the retrial of this case the trial court will give strict attention to the evidence and then declare the law by its instructions covering every phase of the case to which the testimony is applicable in conformity with approved precedents in cases of this character. Instructions should be predicated upon the testimony, and if upon the retrial there is any substantial testimony showing that the defendant sought or provoked the difficulty, or began the quarrel with the felonious purpose and intent of taking the life of Marion Thomas, or of doing him some great bodily harm, the court may very appropriately cover that feature of the case by instructions which conform to the law upon the subject.

Instructions 9 and 10, given by the court upon the subject of threats, were as follows:

"9. The court instructs the jury that if they shall find and believe from the evidence that Marion Thomas made any threats against the life of the defendant, which were not communicated to him, such threats should be considered by the jury for the purpose of determining the intention of Thomas at the time he provoked and entered into the difficulty with the defendant, provided the jury believe from the evidence that Thomas did provoke and enter into the difficulty.

"10. The court instructs the jury that if they believe from the evidence that Marion Thomas made any threats against the life of the defendant, and that such threats were communicated to defendant before the killing, the jury should take into consideration such threats in determining whether defendant was justified in acting upon appearances when he shot Thomas, provided the jury believe from the evidence that Thomas provoked and entered into the difficulty with the defendant."

These instructions should not have been given in that form for the reason that the testimony disclosed by the record did not warrant the giving of them. On the retrial of this cause, if there is any conflict in the testimony as to who was the aggressor at the time of the fatal difficulty, and proof of uncommunicated threats by the deceased against the defendant is made, then, for the purpose of throwing light upon the conduct of the parties, as to who was the aggressor, such threats are entitled to be considered by the jury and the law as to such uncommunicated threats should be declared to the jury in plain and unambiguous terms in accordance with approved precedents by this court. As to any threats which may be shown in evidence made by the deceased against the life of the defendant, or to do him some great bodily harm, which were communicated to the defendant, the jury has the right to

take such threats into consideration in determining the question of the reasonable grounds of apprehension of danger by the defendant, as well as in explanation of the conduct of the parties at the time of the fatal difficulty, and the law upon such communicated threats should be declared in harmony with similar instructions upon the subject which have met the approval of this court.

Upon the question of the propriety of an instruction for manslaughter in the fourth degree, or any other degree, it is sufficient to say that the rules of law as to the state of facts which will reduce the killing from murder in the first or second degree to manslaughter in any of the degrees are well settled in this State, and if upon the retrial there is any substantial testimony tending to show a state of facts which under the law would reduce the killing from murder in the first or second degree to manslaughter in any of the degrees, we assume the court will cover such testimony by appropriate instructions.

We have indicated our views upon the propositions presented in this cause, which results in the conclusion that the judgment in this cause should be reversed and the cause remanded, to the end that an amended information may be filed against the defendant upon which a trial may be had in harmony with the views herein expressed, and it is so ordered.

All concur.