STATE v. WILLIE WRIGHT, Appellant.—No. 38376.—175 S. W. (2d) 866.

Court en Banc, December 6, 1943.

*Geo. L. Vaughn* for appellant.

*Roy McKittrick,* Attorney General, and *Aubrey R. Hammett, Jr.,* Assistant Attorney General, for respondent.

▇ ELLISON, J.—The appellant was convicted of murder in the first degree for fatally cutting one Frank Stewart and his punishment assessed by a jury at death, in the circuit court of the City of St. Louis. The judgment was affirmed in Division 2, but the cause was thereafter transferred by that Division, on its own motion, to the court en banc because of doubt as to whether an instruction on self-defense should have been given, especially in view of prior decisions. The assignments in appellant's brief complain of the insufficiency of the evidence to support the verdict of murder in the first degree; of the failure to give an instruction on self-defense; and of error in the given instruction on manslaughter.

The appellant, Willie Wright, 29 years old, and one Willie Robinson were jointly indicted. A severance was granted and Robinson "took a year" in the City Work House on a plea of guilty, it seems. The deceased Stewart was a negro, as were appellant and most of the other parties prominently figuring in the case, according to our understanding. About one o'clock in the morning of July 14, 1940[1] Stewart was seated with the State's witness Davis and a man named William (who did not testify) in a parked automobile facing west on the north side of Delmar Avenue near the northeast corner of its intersection with Jefferson Avenue in St. Louis. The latter runs slightly to the southeast, and Delmar Avenue east and west. Paralleling it and next south is Lucas Avenue. Next beyond that is Washington Boulevard. Paralleling Jefferson Avenue and a block east is another cross-thoroughfare, 23rd Street. Davis testified that close to their parked automobile the appellant and Robinson, both of whom then were strangers to him, assaulted a third party, an old man ▇ 50 or 60 years old who was passing by, and appellant cut him on the arm with a knife. The witness first volunteered they were robbing or attempting to rob the old man, but that was stricken out. The old man struggled free, his hat falling off, and ran down the street. The appellant pursued him but abandoned the chase and came back. He picked up the old man's hat and threw it on the parked automobile.

Stewart said: "What did you beat that old man up like that for, and then take his hat and throw it up on the car? The officers may come up and think I did it." Then he ordered, "Take it down." Appellant answered, "God-damn it, make me take it down." Stewart got out of the automobile with a coca cola bottle and walked around to the hat on the car. Appellant opened his knife. Stewart said "Get back off of me with that knife." Appellant said, "God-damn it, I want you to make me take that hat off the car," and started toward deceased with the knife. Stewart threw the coca cola bottle at appellant but missed him. Then appellant closed in and "went to

---

[1]The case was tried in 1941; the transcript filed here on leave as a poor person in October, 1942; a continuance was granted on appellant's application in December, 1942; and the cause submitted at the May term, 1943.

cutting'' Stewart, who ''got loose and walked on 23rd Street about a block.'' (This must mean *to* 23rd Street.) Then the witness added, ''and that is where he cut him, and went to cutting him.'' This testimony is ambiguous. It may mean the appellant began to cut Stewart at the scene of the first encounter near Jefferson Avenue, or on 23rd Street a block away, or both. But it shows *appellant* pursued or followed Stewart.

This is of some importance, because appellant contends witness Davis later testified the deceased Stewart pursued appellant, thereby furnishing a basis for a self-defense instruction. And it is true that thereafter, on cross-examination, witness Davis answered ''Yes'' to a confused leading question which assumed a fact: ''Well, how did Stewart, the deceased—he did Stewart, the deceased, did run after Wright from Jefferson and Delmar to 23rd and Delmar? That is true, is it not?'' But subsequently he impliedly denied it, as follows. A few pages further on in the cross-examination, when counsel again asked witness Davis about the deceased Stewart's pursuing the appellant Wright, the witness answered: ''You mean when Willie Wright was running Stewart? That's what you mean, don't you?'' Then counsel referred the witness to his former answer to the leading question, and the witness started to reply: ''You just asked me''— but there appellant's counsel interrupted, cutting off the witness, so that he was prevented from explaining further. It seems to the writer the witness' statement on cross-examination that the deceased pursued appellant after the first encounter was due to a misunderstanding. It certainly is in conflict with what he said on direct examination when he had a better chance to tell his story in his own way. But we pass this point and continue with the further narrative, since there was other evidence on self-defense.

Stewart came back to the ''Workmen's Bar.'' This bar was on the northeast corner of the Jefferson-Delmar intersection near where the automobile was parked. The street number was 800 North Jefferson. There on the sidewalk appellant cut Stewart again. Stewart went inside, collapsed and died. The appellant wanted to hit him with a pepper sauce bottle, and then ran away. Robinson did none of the cutting. The witness identified appellant and the knife—said at least it looked just like the one used—and denied his group were drinking. He further denied that just previously the appellant had been ''playing a harp in the back of the tavern there, drinking wine,'' (apparently at Workmen's Bar); and that Stewart had a knife.

Clifton Kaid, eighteen years old, lived with his mother and stepfather on the second floor just around the southeast corner of Delmar and 23rd Street, a block east of Jefferson Avenue. He heard a bottle break, looked out the window and saw three men fighting. They were across the street. Two of them were fighting and kicking a third who was scuffling on the ground and trying to get up. They were

strangers to the witness but he identified the appellant as one of the two men. He was cutting and the other was kicking the man who was down. Appellant cut the prostrate man on the neck. The latter got up and walked toward Jefferson Avenue, whence he had come according to the testimony of the previous witness, Davis. Appellant followed the man and cut him, or cut at him, twice more. This was by the tavern. This witness' mother, Mary Brown, saw from her window "these two boys" chasing a tall fellow. (Again indicating appellant pursued deceased, not vice versa.) He ran against the curb and fell down. They kicked him some and then "he" (seemingly indicating the appellant) got out a knife and cut the fallen man. She didn't hear the bottle break. The two men went back toward *Washington* and Lucas Avenues (which would be south on 23rd Street) from which they had come, and the victim of the assault went toward *Delmar*. Later the witness changed that, and said the injured man went toward Jefferson Avenue. She identified appellant as one of the assailants.

Harry Bradshaw, thirty-eight years old, worked for the Scullin Steel Company. He had occasionally seen the appellant here and there before the homicide, but did not know Robinson. He was waiting on the corner of 23rd Street and Lucas Avenue for his wife. She was talking to another woman. He heard some one say, "Please don't cut me any more." He saw "the fellow" going across the street. He was about one block north on or near the Delmar-23rd Street intersection. As he looked again the man was running and started to step up on the sidewalk when appellant jumped astraddle of him with a knife. The witness rushed toward them, pulled appellant off, and led Stewart up to the Workmen's Hotel, where he (the witness) withdrew to call an ambulance. While he was doing that appellant came back to the corner and cut Stewart twice more. The proprietor pushed him inside the Hotel, locking the door, and he was dead by the time the ambulance arrived. The hotel man, Juan Nicozisin, saw appellant through the hotel window, but evidently after the assault. He also saw Stewart covered with blood, and while he was calling the police Stewart fell to the floor. Officers Schottel and Robson arrived soon afterward. Schottel took Stewart to a hospital where a doctor pronounced him dead. He was unarmed. The above were the eyewitnesses to the affray, or to events there immediately following.

Appellant was arrested soon afterward in front of his home at 2234 Lucas Avenue, which apparently was near the intersection of that Avenue with 23rd Street. One of the officers summoned by radio to the scene of the crime passed two men running south on 23rd Street between Delmar and Washington Avenues. One of them was the appellant, but the officer did not then know of his alleged connection with the crime. When apprehended the appellant was wiping

his hands, which were bloody, as was his shirt. Officer Skoczek found on the windowsill an open knife with a bloody blade, the one previously identified by witness Davis. Appellant was questioned at the police station. He admitted ownership of the knife in the presence of officers Schottel, Robson and Skoczek. These three policemen testified appellant had been drinking, but in their opinion was not drunk. Appellant there made an oral and a written statement, both of which were introduced by the State. The oral statement was as follows:

"He said that he was in a gangway in the rear of the Workmens Hotel, *18th** and Jefferson—there is a gangway back there—he said he and another man and Stewart were drinking some wine in this gangway, and some woman came up and put her arms around Wright (appellant); Stewart asked him, 'Who is that woman? Is that your woman?' Wright told him no, it wasn't. He said Stewart punched at him, and he suddenly drew—Stewart drew a knife—and he ran out of the gangway down the alley to 23rd, and south on 23rd to Delmar, where the fight started again, and he cut Stewart with his pocket knife—Wright cut him."

The other statement was dictated to the police clerk, who wrote it down. It was signed by appellant and witnessed by officers Robson and Schottel, and was as follows:

"About 1:30 o'clock this A. M. I and a colored man known to me only as half-pint (do not know his name) and another colored man named Frank Stewart were in a gangway in the rear of the Workmans Hotel, at 800 North Jefferson avenue, drinking wine, when some unknown colored woman threw her arms around me, when Frank Stewart asked me if she was my woman, and I said no, then he hit me in the jaw, and drew his knife, and started cutting at me. I ran down the alley to 23rd. street & Delmar Blvd., where he overtook me, grabbed me around the waist, and cut at me three times, missing each time. While he was holding me around the waist I cut at him with my knife, after which he left loose and ran away, running west on Delmar Blvd.

"I walked up to the Workmans Hotel at 800 North Jefferson Ave., where I saw him (the fellow that I had the scuffle with) lying on the floor. I then walked to the southeast corner of Jefferson & Delmar Blvd. where I went in the front door of a pool room at that corner, stayed in there a couple of minutes, and then left by the side door, and walked east on Delmar Blvd. to 23rd street, south on 23rd street to Lucas avenue, east on Lucas avenue, to in front of 2234 Lucas avenue, where I was arrested." (In the statement the appellant further identified a knife as the one he used in the affray, the officers testifying it was the one introduced at the trial.)

*This evidently is a mistake. The Workmen's Hotel was at Delmar and Jefferson. Eighteenth Street parallels Jefferson and is five blocks further east.

The foregoing was the State's case in chief except the testimony of Dr. John J. Connor, who was a coroner's surgeon. He found on Stewart's body just above the left shoulder blade a laceration two inches long, and another of about the same length in the left jugular vein. This latter was the cause of death from external hemorrhage and air embolism in the blood.

When the appellant testified, answering a question on direct examination as to what he did or saw with reference to the death of Stewart, he said:

"I was around at that Workmen's, Jefferson and Delmar, and he was around there in the alley drinking wine, and they drove up in a car, and we was setting around there and I was going, and they was buying wine, and he came back down and asked the girl for a drink of wine; she told him it was my wine; I told her to give him a drink, and he snatched the bottle away from my mouth; he said, 'Are you going to drink before me?', and he hit me in the mouth with the bottle, and we started arguing from then. . . . That was back of the Workmen's. . . . I left there and went on home,—my old lady, she taken me home—. . ."

Then he continued, that "he" followed me . . .; that his (appellant's) old lady went back to get help; and that "he" came up and started another argument. Appellant declared he was drunk at the time and didn't clearly remember what happened. He denied cutting Stewart or having a fight with him, or seeing anyone else do so; and denied owning, having or using a knife. At first he admitted the statement he gave the police was true and then repudiated it, though admitting he touched the pen when his signature was affixed—because the police whipped him. (No such objection was made when the statements were introduced in evidence.) Boiled down, he admitted he had an *argument* with *somebody* back in the *alley*—he didn't know whether it was Stewart; but denied any fighting either on the street or in the alley, and that he cut Stewart at all.

The first of appellant's assignments of error, that the evidence was insufficient to support the verdict of first degree murder, particularly because it failed to show deliberation, is not well founded and no extended discussion is necessary. Under the State's showing the appellant was belligerent from the start. Stewart had rebuked appellant for assaulting the old man and throwing his hat on Davis' automobile, and was walking toward the *hat,* whereupon appellant drew his knife and advanced. Stewart was the one who was acting in self-defense, according to the State's version, when he threw the coca cola bottle. After appellant's first assault or demonstration Stewart walked away. Appellant pursued him and continued the assault at 23rd Street. The testimony of witnesses Kaid, Brown and Bradshaw shows appellant was following Stewart at the corner; and according to Bradshaw's testimony appellant again cut Stewart after

Bradshaw had brought him back to the Workmen's tavern and was 'phoning for an ambulance. All this was sufficient to make deliberation a jury question. Instructions were also given on second degree murder and manslaughter.

▪ The next two assignments complain of error in the State's instruction No. 3 on manslaughter; and of failure to give an instruction on self-defense. The instruction on manslaughter (following instructions on first and second degree murder) defined the crime practically in the language of Sec. 4382, R. S. 1939, Mo., R. S. A., sec. 4382, as follows: " 'Manslaughter' is the killing of a human being not hereinabove declared to be murder in the first or second degree, or excusable or justifiable homicide." Then it defined justifi- able homicide as (italics ours), "the killing of another in the lawful defense of one's person, *as more fully explained in another instruction given you.*" But that other instruction was not given, and the jury were left without any definition of "lawful" self-defense. Appellant asserts this was error. If there was any competent substantial evi- dence of self-defense, it was also the trial court's duty (as appellant further contends) to instruct on it under Sec. 4070(4), R. S. 1939, Mo., R. S. A., sec. 4074(4), as a part of the law of the case. State v. Ford, 344 Mo. 1219, 1227(2), 130 S. W. (2d) 635, 640(6). We therefore treat these two assignments together.

It must be conceded that the manslaughter instruction, No. 3, is practically a counterpart of instructions approved in three cases cited below,[2] especially the Bradford case. But in that case and the Gore case a self-defense instruction was given. In the Gadwood case a self-defense instruction was not given; but the accused did not com- plain of that. His objection went to the instruction's definition of justifiable homicide as the lawful defense of *one's* person. He con- tended it would exclude the defense that he acted in defense of *other* persons whom the deceased was trying to kill. The Gore case held our statute, Sec. 4382, supra, abolished the former statutory degrees of manslaughter and made every homicide manslaughter unless it was either first or second degree murder, excusable or justifiable.

Since then instructions have been approved which adopt the statutory definition of manslaughter—consisting as it does largely of exceptions. But we can see no reason for stating these statutory ex- ceptions (such as self-defense) in an instruction if there is no sub- stantial evidence on them. It would be a pure legal abstraction without factual basis. This was the conclusion reached in the Gadwood case [342 Mo. l. c. 496, 116 S. W. (2d) l. c. 59(26)] with respect to the definition of justifiable homicide, as bearing on the defense of protecting the life of *third* parties. We held there was no such evi-

---

[2]State v. Gadwood, 342 Mo. 466, 494, 116 S. W. (2d) 42, 58; State v. Bradford, 324 Mo. 695, 705, 24 S. W. (2d) 993, 996; State v. Gore, 292 Mo. 173, 186, 237 S. W. 993, 997.

dence in the record there. If that theory be correct, then the error in manslaughter instruction No. 3 here (the reference to a self-defense instruction when there was none) was harmless in the absence of evidence on that defense. But if there was such evidence a self-defense instruction should have been given. Whether or not there was competent evidence of that character is the decisive question on both of these assignments.

The writer doubts if the single answer "Yes" of the witness Davis, when asked if it was not true that the deceased pursued appellant, (as detailed earlier in the opinion) furnished a substantial basis for a self-defense instruction, when the context is considered. But the oral and written statements made by appellant to the police upon his arrest soon after the homicide, clearly called for such an instruction. On the other hand his testimony at the trial, where he denied making those statements and that he assaulted Stewart at all, would not support an instruction of that kind. State v. Singleton (Mo. Div. 2) 77 S. W. (2d) 80, 83(5).

So the further question is whether an instruction on self-defense should have been given, based on his prior extra-judicial statements to the police, although he repudiated them at the trial and told a story negativing self-defense. In other words, were those statements available for appellant's use in the circumstances? Certain it is that a defendant cannot make prior self-serving statements out of court justifying a self-defense instruction; follow that by inconsistent testimony at the trial completely exculpating himself of any violence at all; and then go to the jury on both theories. The prior self-serving statements would be incompetent anyway if offered by him and not a part of the res gestae. 16 C. J., sec. 1265, p. 635; 22 C. J. S., sec. 737, p. 1269; State v. Perkins (Mo. Div. 2) 92 S. W. (2d) 634, 638(2), and many cases cited in 9 West's Mo. Dig., sec. 413, p. 213.

Nevertheless it was held in State v. Creighton, 330 Mo. 1176, 1194, 52 S. W. (2d) 556, 562, and State v. Bidstrup, 237 Mo. 273, 284, 140 S. W. 904, 907, that the testimony of a defendant against interest does not rise to the dignity of a conclusive judicial admission; and that he is therefore entitled to a self-defense instruction, though inconsistent with his own testimony, if warrant therefor be found in any other evidence in the case on either side. This ordinarily would be testimony of third party witnesses for the defendant, or witnesses for the State. And in the Bidstrup case the inconsistent testimony did come from a state's witness. The same was true in State v. Schamel (Mo. Div. 2) 177 S. W. 351, 352(4), which followed the Bidstrup case. But in the Creighton case, as here, it came neither from a third party defendant's witness, nor from a state's witness, but was a prior, extrajudicial inconsistent statement of the *defendant*, himself, ▬ introduced by the *State*. Notwithstanding that, the decision held the evidence required an instruction on manslaughter (and

would have required one on self-defense if the issue had been on that point).

. The real question here is whether the ruling in the Creighton case was erroneous. We have just conceded the *defendant* cannot introduce his own prior self-serving statements (outside the res gestae), which are inconsistent with his testimony at the trial, and go to the jury on both issues. But how is it when the *State* introduces those statements for its own purposes? The well settled rule is that where the State proves part of single, connected admission or statement of the defendant relating to the same subject matter, the defendant is entitled to show the whole of it. 16 C. J., secs. 1263, 1265, pp. 634, 635; 22 C. J. S., secs. 735, 737, pp. 1266, 1269. And by the same reasoning, if the State has introduced the whole admission or statement, the defendant would be entitled to rely on the parts thereof favorable to him. *He* is not the one who introduced it. He is merely saying, in effect, that if the State desires to present his statement to the jury they must consider the part in his favor, though inconsistent with his own testimony.

We can see nothing wrong in that contention. By the weight of authority, the accused in a criminal case can rely on inconsistent defenses. 16 C. J., sec. 70, p. 98; 22 C. J. S., sec. 54, p. 118. This should be especially true when the State proves them. And in this case the State by the use of the statement was introducing a new fact theory—that appellant cut deceased in the alley or gangway back of the Workmen's Tavern—which was inconsistent with its own theory that the fight started out in the street on Delmar Avenue where the automobile was parked. The statement proved also that appellant committed the homicidal assault with his own knife, a fact which he wholly denied at the trial. Surely, on the state's own showing he was entitled to have those parts of the statement considered by the jury, which disclosed in what circumstances he did the cutting.

As said in the Creighton case, supra, there is an exception to the above rule governing inconsistent defenses when the defendant does something to influence the course of the trial, and to confine it to the theory on which the cause was submitted. Thus in State v. Baker, 262 Mo. 689, 698, 172 S. W. 350, 353, where the trial court asked whether a certain issue was in the case and the defendant answered in the negative, it was held the answer took that issue out of the case. And in State v. Philpott, 242 Mo. 504, 512, 146 S. W. 1160, 1161, et seq., a homicide case, where the defense protested against the giving of a manslaughter instruction, this court said he could not thereafter complain because the instruction was not given. But a defendant is not foreclosed merely because he failed to *ask* an instruction on manslaughter or self-defense, for under Sec. 4070(4), supra, the court is required to instruct on those issues whether requested or not. State v. Burrell, 298 Mo. 672, 679, 252 S. W. 709, 711(1).

At the close of the trial here, when the court had marked the instructions given and refused, appellant's counsel excepted to the failure to give an instruction on self-defense, though he had not asked for one. The court said the instruction had not been given because it had not been requested, and he did not consider it mandatory—this doubtless in view of appellant's testimony at the trial. But we think the doctrine of the Creighton and Bidstrup cases applies.

For this reason the judgment is reversed and the cause remanded. *Leedy, Tipton, Clark, JJ.*, and *Douglas, C. J.*, concur; *Hyde, J.*, dissents in separate opinion; *Gantt, J.*, dissents and concurs in dissenting opinion of *Hyde, J.*

HYDE, J. (dissenting).—I cannot concur in the holding herein that the court was required to submit an issue on self-defense to the jury. I do not see how there can be any issue of self-defense in this case. No doubt the facts set out in the statement of defendant, given to the police and offered by the state, would have been sufficient to raise such an issue. Of course, the state offered defendant's alleged statement to show that defendant was the owner of the bloody knife found by the police. However, the state had the right to prove the falsity of any exculpatory statements therein (22 C. J. S. 1478, Sec. 842); and the state did have evidence to show an entirely different state of facts under which there was no evidence to support an issue of self-defense.

If the defendant had not testified at all, so that an unrepudiated statement (supporting self-defense) and the state's version (showing no self-defense issue) were both before the jury, then unquestionably the court would have had to submit the issue of self-defense. But defendant himself completely repudiated all parts of the statement which could support a self-defense issue, saying that he "didn't tell them that". The defendant said he said he "never had no fight with Frank Stewart". He not only testified that the knife, identified by the statement as his knife, was not his but further stated that he did not have any fight with a knife that night at all and that he "never even had a knife". He also stated that he never signed the statement but only touched the pen when he was forced to do so. (He only admitted an argument with someone he did not know but insisted he had no fight.) Thus, both the state and the defendant claim that the only facts in defendant's alleged statement which could be a basis for a self-defense issue were not true and that nothing like that actually happened. How then can it be said that there is any substantial evidence in this case to show that defendant killed Stewart in self-defense? In this situation, it seems to me that submitting a self-defense issue to the jury would require them to determine a purely hypothetical issue not based on any substantial evidence in the case.

It seems to me that the situation is very different here than in either State v. Bidstrup, 237 Mo. 273, 140 S. W. 904 or in State v. Creighton, 330 Mo. 1176, 52 S. W. 556. In both of these cases the defendant therein admitted doing the shooting, instead of claiming he had no part in the occurrence and did not have or use any weapon, as in this case. In the Bidstrup case the state's whole evidence, the testimony of the prosecuting witness himself, was held to show facts authorizing a finding that defendant acted in self-defense. In other words, the version and theory of the occurrence which the state claimed to be true reasonably authorized the inference that defendant acted in self-defense. In the Creighton case the defendant claimed that he acted in self-defense and testified to facts which would so show. The question was whether or not a manslaughter instruction should have been given as well as a self-defense instruction. Defendant had ample evidence to show violence toward him by the deceased which was corroborated by his statement given to the police and offered by the state. (He did not completely repudiate this statement as did defendant here.) Manslaughter was not inconsistent with the facts in evidence, claimed to be true, if the jury believed part of them but not all of them. In other words, the jury could well have found that defendant did not believe his own life was in danger, but still have found that the deceased did show hostility toward the defendant (as defendant claimed) sufficient to agitate and anger him.

In this case, the state's evidence shows an unprovoked assault with a knife upon deceased, an unarmed man; while the defendant's evidence was that he was never in any knife fight at all and did not even have a knife at that time. Moreover, the facts relied upon in defendant's statement, to support a self-defense issue, were not only denied and repudiated, but defendant said that he did not sign it at all; and further claimed that it recited a state of facts which did not occur and which he never told the police did occur. Thus, in the Bidstrup and Creighton cases, there was substantial evidence to prove the issue therein required to be submitted, because there was positive evidence of witnesses (who claimed such facts were true) upon which to base it. In this case, no witness claims the facts in defendant's statement (which alone would justify a self-defense issue) were true, but both the state and defendant claim they were not true; so that to submit this issue to the jury would be to authorize the jury to find a state of facts to be true which both parties say is not true. I cannot agree that the trial court committed error in failing to submit such an issue because I can see no substantial evidence on which to base it. *Gantt, J.,* concurs.