**STATE of Missouri, Respondent,**

v.

**W. A. BROOKSHIRE, Appellant.**

No. 49152.

Supreme Court of Missouri,

Division No. 1.

April 8, 1963.

Motion for Rehearing or to Transfer
to Court En Banc Denied
June 4, 1963.

W. A. Brookshire, pro se.

Thomas F. Eagleton, Atty. Gen., James J. Murphy, Asst. Atty. Gen., Jefferson City, for respondent.

WESTHUES, Judge.

In June, 1961, the defendant W. A. Brookshire was tried in the Circuit Court of Cooper County, Missouri, on a charge of murder in the first degree. A jury found him guilty of murder in the second degree and assessed his punishment at ten years' imprisonment in the State Penitentiary. A motion for new trial was filed and overruled. Thereafter, the court entered a judgment and sentenced the defendant in accordance with the verdict. Defendant appealed from the judgment to this court.

The information filed in the Circuit Court of Boone County, Missouri, alleged that Brookshire did on the 9th day of November, 1960, kill one Roderick J. Neiss by shooting Neiss with a .32 caliber Colt automatic pistol. On application of the

defendant, a change of venue was granted. The court transferred the case to Cooper County, Missouri.

In the trial of the case, the defendant was represented by attorney Richard K. Phelps of Kansas City, Missouri, a member of the Missouri Bar. The defendant, a lawyer, also took an active part in his own defense. Mr. Phelps represented Brookshire throughout the trial and argued the motion for a new trial. The defendant also made an argument on the motion for new trial and thereafter represented himself and personally briefed and argued the case in this court.

The defendant, in one of the points briefed, stated that the evidence "established beyond any honest doubt that the killing of deceased was justifiable homicide." We shall state the facts as shown by the record with that contention in mind.

Defendant, on the day of the homicide, lived on a farm in Boone County, Missouri, about 11 miles south of Columbia, Missouri. Two farm hands, Roderick J. Neiss and Richard Polly, occupied two rooms adjoining the house at the rear. No other persons lived in the house. Defendant usually prepared the meals. The duties of the farm hands included taking care of a large herd of cattle which defendant owned. On the evening of November 9, 1960, at about 8:30 o'clock, the sheriff of Boone County received a telephone call from the defendant Brookshire. He informed the sheriff that he had shot a man but was not sure the man was dead. The sheriff was asked to come and bring an ambulance. The sheriff testified that when he arrived at the home, defendant was waiting on the outside. Defendant told the sheriff that he was afraid to go into the house; that he did not think the man was dead. The sheriff, his two deputies, and Brookshire went into the house. They found the dead body of Neiss lying on his back at the bottom of a stairs leading to the second floor of the house.

Sheriff Powell testified that Brookshire described the occurrence in detail as follows: About 6:00 p. m., Brookshire was preparing supper in the kitchen when Neiss, after doing some chores, came in and asked defendant to get some wood for the stove in Neiss' room. Brookshire told Neiss to get his own wood. This angered Neiss and he began quarreling with defendant about not having any wood. All three men, Brookshire, Neiss, and Polly, ate supper together at the kitchen table and Neiss continued to argue. After supper, Brookshire told Neiss to go to his room. Brookshire then went upstairs and read awhile. Neiss, during this time, stated a number of times, "I am a Sioux Indian and you had better quit fooling with me." Further, Neiss had claimed that he had cut a number of people with a knife. The sheriff testified that defendant's account was that after being upstairs awhile, Brookshire came back downstairs and saw Neiss was still in the kitchen; that Brookshire said he again asked Neiss to go to his room but that Neiss again threatened defendant and followed him, Brookshire, upstairs and then went back down the stairs. Brookshire then went to his bedroom, got his gun, and went back and saw Neiss still in the kitchen. The sheriff stated that Brookshire told him that when he neared the kitchen, "They started arguing. He said, 'Better not fool with me. I am a Sioux Indian.' And this time he took after him and he overtaken him, or was gaining ground on him. He took back up the steps and he got about eight steps up. Neiss was on about the fourth step, and he was gaining on him, and he just whirled and shot him. Just whirled around and shot him."

The sheriff testified that Brookshire re-enacted his version of what occurred on the steps when the fatal shot was fired as follows:

"Q  Did the defendant say whether or not Neiss was still coming towards him when he fired?

"A  He did.

"Q   What did he say?

"A   We reenacted this scene and —

"Q   By we, who do you mean?

"A   He and I.  Brookshire and myself.

"Q   By reenact, what do you mean? He went through the motions?

"A   Went through the motions.

"Q   In the house?

"A   In the house.  I went to the head of the table, where he said Neiss was standing, and he stood in the hallway, where he said he was standing when they took up the stairway the last time, when he shot him.  And he had me, with one hand up and the other one on the hip pocket, and he said, 'He was in that position.  But you want to look mean because he looked mean.  He was vicious coming towards me.'

"Q   Did the defendant ever say whether or not Neiss would have come on into him if he hadn't fired?

"A   He did.

"Q   What did he say?

"A   He said that while they were talking at the—the last time he started, when he took after him, the last time he taken after him, that he says, 'I cut one man's guts out and I will cut another one.'

That he kept coming towards him."

The sheriff testified further that defendant told him that he had left things just as they were when Neiss fell as a result of the shot. When the deceased's body was examined, he had on two pairs of trousers.  In a pocket of the inner pair, a closed Barlow knife was found.

Brookshire, in his testimony, stated that Neiss during the evening threatened him a number of times saying, "He was going to cut my guts out and I assume he was going to use a knife."  Brookshire testified he did not see Neiss have a knife just prior to the shooting but that a few days before the shooting deceased borrowed a whetrock from him to sharpen a knife; that he saw the knife which was a large black-handled knife, not the one found on the body of Neiss.  Brookshire testified that he found this large knife open lying next to the body of Neiss after the shooting; that he picked it up and placed it in a table drawer in the kitchen.  It was in evidence, and Brookshire admitted, that he did not mention the presence of the knife to anyone until *after* the coroner's inquest at which Brookshire testified.  Brookshire's testimony was that after the coroner's inquest, he went to his home and found the knife under a kitchen table.

As to what happened immediately before the shooting, Brookshire testified that after Neiss had followed him up the stairs, "I kept begging him to go down and finally he went down.  I thought he would leave the house.  I went about halfway down the stairs and I could see he was standing in the kitchen.  I went back to my bedroom and in the night stand drawer, at the head of my bed, I had a .32 automatic Colt revolver, the one that was introduced in evidence.  I got that and went down and saw that he was still down there.  I went through the hall and went almost to the kitchen door. As I got within sight of him, he turned, he says, 'I am going to finish you off,' and started after me.  I started back.  I had the gun in my hand.  I started back and he was gaining on me.  I started up the stairs.  I told him to stop.  He didn't stop.  I got about halfway up the stairs, seventh or eighth step.  He had—

"Q   Do you mean the seventh or eighth step from the bottom?

"A   Seven or eight steps from the bottom.  There are 19 steps on the stairway.  I don't know exactly, but I was about the seventh or eighth step. He had come up three to four steps and I turned and fired.  I didn't know that

I had hit him. He began stepping back and fell down to the foot of the stairs, fell on his back, with his head almost to the wall, almost to the door."

There was a wound at about the middle of the forehead of the deceased from which some blood had trickled down to the hair line of the head. This wound was obvious and the persons present shortly after the shooting evidently were of the opinion that Neiss had been shot in the forehead. Brookshire had contended at the preliminary hearing that deceased was shot in the forehead and he claimed that a photograph showed the wound. When asked about that at the trial, he gave the following testimony:

"Q Was this picture offered at the preliminary hearing?

"A I am sure it was because I am sure in my argument that I argued that point. I can tell you why that injury was to his forehead. I was convinced, Polly was convinced, the sheriff was convinced. It was in the newspapers the next day that he was shot in the forehead. I saw the coroner. I stood there over him. He took his fingers and worked the bones in his forehead and some blood came out. That is the first time I saw blood there. And there is a picture there that shows where that blood had oozed out or streamed out."

Exhibit 1, introduced in evidence, was a photograph in which the wound on the forehead was visible. Dr. Richard E. Johnson, a pathologist and the coroner of Boone County, testified that he arrived at the Brookshire home at about ten o'clock on the night of the shooting; that he examined the body of the deceased. As to the wound in the forehead, he gave the following evidence:

"Q And what if any wounds or abrasions or traumatic injuries of any kind did you find on the body of the deceased at that time?

"A At that time I found just two points of injury. The most obvious one was the, a large swelling in this region, just above the ridge of the nose, rather close to the midline of the forehead.

"Q By midline, do you mean the line running straight down?

"A Yes. Vertical.

"Q Was this swelling at this place, was this bleeding?

"A Yes. A small trickle of blood had run from abraded skin over the swelling across the forehead to the hair line.

"Q Were you aware at that time that this was merely an abrasion or a swelling of some sort?

"A After completing my examination, yes, sir, I felt.

\*    \*    \*    \*    \*    \*

"Q Was this swelling, did you know at the time that it was only a swelling?

"A Yes. I felt so. By palpation I could move the swollen area over the underlying skull. I felt that it represented merely a hemorrhage into the tissues of the face itself without involvement of the underlying skull."

Dr. Johnson testified that he performed an autopsy and found that the skull at the forehead had not been punctured. As to other wounds on the body, discovered on the night of the shooting, the doctor testified:

"Q I see. Did you determine any other injuries to the head at that time?

"A. Yes, sir. There was an obvious wound in the posterior region of the scalp, on the right and just below the vertex, to the top of the skull, back a little bit to the right of the midline.

That appeared to be a penetrating injury.

"Q And was there blood around this injury?

"A Yes. There had been appreciable bleeding from that wound. It spread out over into the hair, the mat of the hair and to newspapers on which he was lying."

Further testimony of the doctor was as follows:

"Q How long were you there at the scene with the body before they removed it?

"A Perhaps in the vicinity of three hours.

"Q During your time there at the scene, did you ever find a weapon of any kind around the body of the deceased?

"A. No, sir."

Dr. Johnson, on being asked about his findings at the time of the autopsy, gave the following testimony:

"Q And what other injuries did you find to the head?

"A Well, at the time of the autopsy—

"Q. Yes.

"A I confirmed the fact that the injury to the tissues of the forehead did not involve the underlying skull. There was no injury to that at all. It was intact. The wound in the right occipital region was actually a penetrating wound of the skull, made by a missile. And the missile was found within the cavity of the skull. I knew some of these facts from the preliminary X-rays.

"Q Were you able to determine from the X-rays that the bullet was in the skull?

"A Yes, sir. It is readily visible in the X-rays.

"Q What else is visible in the X-rays as far as that wound is concerned? Is the course of the missile ascertained from the X-ray? The direction it went?

"A No. The one limit of the course, one defining limit can be determined from the point of entrance—

"MR. PHELPS: We can't hear the witness here. We cannot hear the witness.

"THE COURT: Doctor, will you speak louder, please?

"THE WITNESS: The one possible course of the missile can be determined from the point of contact of the missile with the skull which can be determined and its final position, aligned between those two points indicate a possible path that the missile actually took.

"Q You have referred to this area medically speaking. How would you describe it in layman's terms, as the location of this wound?

"A Well, it is on the back, the back aspect of the skull, very close to the center line, and—well, that is about it.

"Q Very close to the center, but on the back?

"A On the back, over the peak, beyond the peak

"Q Which direction did this bullet range? Which way did it go from the wound of entrance? In other words, what is the relation of the bullet and the wound of entrance as far as direction is concerned?

"A The course, placing the individual in a standing position, upright standing position, the course is from the right. It went, of course, downward to the left and angled a little bit forward.

"Q Down to the left and forward.

"A And forward. The line drawn from the point of entrance to the final position of the missile.

"Q What was the cause of the death of Roderick Neiss?

"A. Hemorrhage into the brain tissues as the result of this missile penetrating the skull.

"Q Do you have any opinion, Dr. Johnson, as to how long Roderick Neiss was alive after this missile struck him?

"A He was dead when I arrived at 10:00 a. m. He had been dead perhaps an hour or so. I would expect his—he could have survived as long as half an hour, from the nature of the injuries."

Other facts will be related in the course of this opinion.

The brief filed in this court by defendant Brookshire contains twelve separate assignments of error. In substance, these assignments are: that the information is insufficient; that the Circuit Court of Cooper County lacked jurisdiction; that his lawyer was incompetent; that the prosecuting attorney was guilty of suborning perjury; that the trial court erred in not directing a verdict of not guilty; that the court erred in giving instruction No. 2 on murder in the first degree; that the court erred in giving instruction No. 3 on murder in the second degree; that the court erred in giving instruction No. 4 defining "feloniously," "wilfully," "deliberately," and other words usually employed in instructions on murder; that the court erred in failing to give a manslaughter instruction; that the court erred in refusing to give instruction B on the right to defend the defendant's home; that the court erred in its refusal to give instruction H to the effect that the State vouched for the truthfulness of evidence given by witnesses for the State; and, finally, that the court erred in permitting the enemies of the defendant to testify concerning the veracity of the defendant.

We shall dispose of the assignments briefed in the order stated supra.

In his brief, defendant contends that the information was deficient in that "The information did not state facts sufficient to constitute a crime in that the weapon alleged to have been used was not loaded with leaden balls or any kind of ammunition that was deadly, and in that the information does not allege when and where the deceased died, and for these reasons was fatally defective."

The information reads: "Comes now Larry M. Woods, Prosecuting Attorney within and for the County of Boone and State of Missouri, and upon his official oath informs the Court that W. A. Brookshire on or about the 9th day of November, 1960, at the said County of Boone and State of Missouri, did in and upon one Roderick J. Neiss feloniously, wilfully, premeditatedly, deliberately, on purpose and of his malice aforethought, make an assault with a deadly and dangerous weapon, to wit: a .32 caliber Colt automatic pistol, did shoot, discharge, strike and wound the said Roderick J. Neiss, and by reason thereof the said Roderick J. Neiss did die; and Larry M. Woods, Prosecuting Attorney of Boone County, Missouri, upon his official oath aforesaid, does say that W. A. Brookshire in the manner and means aforesaid, feloniously, wilfully, premeditatedly, deliberately, on purpose and of his malice aforethought, did kill and murder him, the said Roderick J. Neiss; against the peace and dignity of the State." (Omitting signature and oath of Prosecuting Attorney.)

The information was signed and sworn to by the prosecuting attorney on the 9th day of December, 1960, one month after the shooting occurred. It was filed that same day. Defendant did not file a bill of particulars as authorized by S.Ct. Rule 24.03, V.A.M.R., nor did he question the sufficiency of the information in any manner before trial. The trial was had in June, 1961, within one year after the offense was alleged to have been committed. Defend-

ant admitted the shooting to have occurred on November 9, 1960, and that death resulted within a short time on the same day. His defense was self defense and defense of his home.

S.Ct. Rule 24.01 provides that "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. * * * It need not contain a formal commencement, a formal conclusion or any other matter *not necessary* to such statement. * * *" (Emphasis supplied.)

S.Ct. Rule 24.11, which is substantially the same as Sec. 545.030, V.A.M.S., reads in part that no information shall be deemed invalid for any "defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits: * * *."

■ We are of the opinion that the information meets the requirement of S.Ct. Rule 24.01, supra. The information, dated December 9, 1960, in substance, charges that the defendant W. A. Brookshire, on the 9th day of November, 1960, in Boone County, Missouri, did make upon one Roderick J. Neiss an assault with a deadly and dangerous weapon, that is, a .32 caliber Colt automatic pistol, did shoot the said Neiss, and by reason thereof Neiss did die. Further, the information charged that defendant in the manner and means aforesaid feloniously, wilfully, premeditatedly, deliberately, on purpose and of his malice aforethought did murder Neiss. The charge contains all the essential elements of murder. It is expressed in language of sufficient certainty as to leave no doubt that the charge against defendant was that he shot and killed Neiss on November 9, 1960, in such manner as to be murder in the first degree.

The defendant, in support of his contention that the information is bad, cited State v. Johnson, 191 Mo. 177, 90 S.W. 89; State v. Williams, 184 Mo. 261, 83 S.W. 756, and State v. Furgerson, 152 Mo. 92, 53 S.W. 427.

In State v. Furgerson, the deadly weapon involved was an ax. The indictment was held bad on the ground that the word "with" was omitted and for that reason it was not charged that the homicide was committed *with* an ax. We need not comment on the ruling made in that case. In the information now before us, it was charged that the assault was made *with* a .32 caliber Colt automatic pistol. State v. Baird, 297 Mo. 219, 248 S.W. 596, 1. c. 598(1). In State v. Williams, an information was held bad because it omitted the words "then and there" so that the charge of felonious assault was not connected with the wounding. In State v. Williams, the court cited Chitty's Criminal Law as authority for its ruling. In State v. Johnson, the court followed the ruling in State v. Williams, and State v. Green, 111 Mo. 585, 20 S.W. 304, was there considered a leading case.

This court, however, long ago departed from the extremely technical requirements of common law indictments and informations. See State v. Stringer, 357 Mo. 978, 211 S.W.2d 925, where the subject was considered at length and in which State v. Green; State v. Williams; State v. Johnson, and Chitty on Criminal Law, supra, were mentioned. In speaking of the old rules concerning the form of indictments and approving quotations from various authorities, the court stated (211 S.W.2d 1. c. 928, 929): "The underlying and really basic reasons for the enforcement of the extremely technical requirements of common law indictments and informations have often been noted and we indicate them but briefly. At common law all felonies, particularly all homicides, were punishable by death. 1 Stephen, History Of The Criminal Law Of England, p. 487; 1 Hale, Pleas Of The Crown, p. 351. There were the attendant consequences of attainder, forfeiture of property and corruption of blood. 2 Coke Upon Littleton, 391b. Of necessity some palliatives to these severe judgments and their consequences had to be invented. 'Undoubtedly, the merciful inclination of the judges in favor of life

accounts for a large part of the purely technical requirements in the old indictments. The technical rules served a justifiable and even necessary purpose in restraining the brutal severity of the criminal law a century (and a half) ago.' 10 Har.L.R. 98, 101 (1897). (See also the notes in 39 U.Mo.B. 37 and 30 Jour.Crim.L. & Crim., p. 135 and a comparison of the indictment as it was in State v. Barrington, 198 Mo. 23, 95 S.W. 235, and as it would be today under the English practice in 12 St.L.L.R. 281.) These basic reasons for the rules have ceased to exist and 'It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule persists from blind imitation of the past.' Holmes 'The Path Of The Law' (10 Har. L.R. 457)." See also the case of State v. Haynes, Mo., 329 S.W.2d 640, where certain omissions from an information were considered. This court there said (l. c. 643): "All of the essential elements of the crime of murder in the first degree are sufficiently alleged. Further, since no attack was made upon the amended information before the trial, any indefiniteness in the description of the way the crime was committed may not be considered after verdict."

We rule the information sufficient and further that the omission of the words "then and there" and the omission of an allegation that the pistol was loaded with leaden balls did not render the information fatally defective. State v. Stringer; State v. Haynes, supra; State v. Finn, Mo., 243 S.W.2d 67, l. c. 70(1); State v. Dildine, 330 Mo. 756, 51 S.W.2d 1, l. c. 2(4–6).

■ Defendant says that the information is fatally defective in that it does not allege the time of death of the victim and that such an allegation is necessary because if death does not occur within one year and a day after the date of the alleged act of homicide, it is not murder. That contention may be sound in cases where time is an issue such as in a case where due to circumstances a prosecution cannot be or is not begun until a year or more after a homicide. However, in the case before us, the information was filed December 9, 1960, charging that Brookshire shot and killed Neiss on November 9, 1960. The trial was had in June, 1961, within less than one year after the fatal shooting. These facts appear on the court records. The omission of an allegation as to the time of death could not and did not prejudice the rights of the defendant. In such circumstances, what justification could any court give to remand the case for retrial? The answer is obvious. We rule the defendant was not prejudiced by the omission. We are supported in our ruling by a number of cases wherein facts similar to those in the case now before us were presented to the courts. In People v. Corder, 306 Ill. 264, 137 N.E. 845, l. c. 848, 849 (1–3), the court, in speaking about the omission of the day death occurred in a homicide case, said, "Where, as in this case, it appears from the indictment that the indictment was returned within a year and a day after the cause of death was administered, it is not necessary to allege the exact date of the death."

In a similar situation, the Oregon Supreme Court, in State v. Kelley, 118 Or. 397, 247 P. 146, l. c. 151(17), stated, "If the defendants killed Sweeney on the day mentioned he must have died at that time. No man can be said to be killed unless he is dead." In Milburn v. Commonwealth, 223 Ky., 188, 3 S.W.2d 204, l. c. 205(2), where an indictment was returned on October 6, 1926, wherein it was charged that deceased "was shot on the ——— day of ———, 1926," but no date was stated, the court said, "It necessarily follows that the death of Hays occurred within a year and a day from the infliction of the wound, * * *." See also State v. Stone, 169 Wash. 233, 13 P.2d 427, l. c. 428(1).

The next point briefed is that the Cooper County Circuit Court did not have jurisdiction on the ground that defendant did not disqualify Judge Dinwiddie of Boone Coun-

ty, Missouri; that Judge Samuel E. Semple was illegally transferred to Boone County for the purpose of ruling on defendant's application for a change of venue which was based on the prejudice existing in Boone County. There is no merit in this contention. In the application for a change of venue, the defendant made the following statement:

"3. The Defendant further states that the Honorable W. M. Dinwiddie and the Honorable Sam C. Blair, are so sensitive to newspaper publicity that they would and have refused the Defendant a fair and impartial trial because of newspaper publicity."

Judge Dinwiddie entered an order sustaining the application for disqualification and requested the Supreme Court to substitute a judge. The Supreme Court made an order temporarily transferring Judge Semple to the Boone County Circuit Court. Judge Semple ordered the cause to be sent to Cooper County for trial. No objection was made by the defendant to any of these orders prior to the time the case reached Cooper County.

■ When the case reached Cooper County, defendant moved that the cause be remanded to the Boone County Circuit Court on two grounds, to wit: first, that in his application for change of venue, he had not disqualified Judge Dinwiddie; and second, that in his application, he had alleged that prejudice existed against him in Boone, Cooper, Howard, Randolph, Audrain, Callaway and Cole Counties. In this application, defendant stated that two newspapers published in Columbia, Missouri, were widely circulated in the named counties and that these newspapers had so misrepresented the facts that he could not have a fair trial in any of the counties named. There is no merit in these contentions. This court en banc, in the case of State ex rel. Wolfner v. Harris, 312 Mo. 209, 278 S.W. 668, 1. c. 669(2), stated that "Nothing is better settled in the practice of this state than that

the only way to remedy the irregular or erroneous awarding of a change of venue is by saving exceptions at the time the change is ordered and in the court in which ordered." A like ruling was made in State v. Wilson, 345 Mo. 862, 136 S.W.2d 993. Defendant cited the case of Thompson v. Sanders, 334 Mo. 1100, 70 S.W.2d 1051, in support of his contention. A reading of the opinion in that case indicates that it is authority against defendant. The law is also well settled that a defendant may not allege in his application for a change of venue that prejudice exists in multiple circuits. In his application, the defendant alleged prejudice to exist in three judicial circuits and a portion of two others. This he may not do. State ex rel. Cottrell v. Wofford, 119 Mo. 408, 24 S.W. 1009.

■ There is no merit in defendant's assignment that his attorney, Richard K. Phelps, was in any way incompetent to defend Brookshire properly. The record shows that Phelps was very alert during the trial. The argument made by Phelps to the jury was vigorous and intelligent. Furthermore, the record justifies the statement that Phelps was a former schoolmate of Brookshire and came to his aid in an hour of need; that he took an unusual interest in the case. It ill behooves Brookshire now to state that Phelps was in any way incompetent. The point is ruled against the defendant.

■ In point four of the brief, Brookshire states that he was denied due process of law because the prosecuting attorney was guilty of suborning perjury. Brookshire lists twelve of the State's witnesses as committing perjury. This is, indeed, a bold charge to make. The record is devoid of any substantial evidence indicating perjury on the part of the witnesses named. To refute this baseless charge, we shall state defendant's theory or reason for claiming perjury. As to one witness, Brookshire's contention is " * * * perjury suborned by the Prosecuting Attorney, Larry Woods and committed by Dr. Richard E. Johnson, a witness for the State that the bullet that

pierced the head and that caused the death of the deceased Neiss, entered from the back of Neiss's head." Brookshire says that evidence of the doctor was perjury because witnesses viewing the body of the deceased on the night of the shooting made statements that the deceased had been shot in the forehead; further, that Exhibit 1, supra, showed a wound in the forehead. Dr. Johnson's evidence was not based on appearances but on the results of an autopsy. It would serve no useful purpose to extend this opinion, already too lengthy, to review charges against other witnesses. The charge of perjury is utterly without foundation in fact.

■ In assignment five, it is contended that the evidence established that the killing was justifiable homicide. In fact, defendant, in his reply brief, states that "The appellant in his brief has shown conclusively that the Coroner's testimony in the trial established the fact that the bullet entered the forehead." It is our opinion that the facts and circumstances of the shooting, as stated supra, were sufficient to justify a finding that the killing was not justified. The jury could well have drawn the inference from the evidence that when Brookshire went to his room, procured the pistol, and with it in his hand went back downstairs where deceased was, he was seeking trouble. The jury could also infer that deceased was shot in the back of the head and not in the forehead as claimed by the defendant; further, that the knife which Brookshire claimed was lying beside the body and which was not mentioned until after the coroner's inquest, was in fact not lying beside the body as claimed. Then, too, fourteen witnesses testified that Brookshire's reputation for truth and veracity was bad. Among these witnesses were a state senator, a state representative, a school teacher, county officers, lawyers, farmers, and neighbors of Brookshire. Not a witness testified to the contrary. We rule that the evidence was sufficient to sustain the verdict of the jury. Cases cited by the defendant, such as State v. Whited, 360 Mo.

956, 231 S.W.2d 618, are not in point. In that case, the deceased had administered a severe beating to the defendant. This court held the evidence supported manslaughter and not murder in the second degree.

■ Defendant says instruction No. 2, submitting the case to the jury on murder in the first degree, was erroneous. Since the verdict found defendant guilty of murder in the second degree, we need not review this assignment of error. State v. Strong, Mo., 339 S.W.2d 759 l. c. 765(8).

■ In point No. 7, defendant says the court erred in giving an instruction (No. 3) on murder in the second degree. The point is made that the evidence was insufficient to sustain a verdict of murder in the second degree. In addition to what has already been said, we shall treat this assignment to some extent later in this opinion in dealing with the failure of the court to give a manslaughter instruction. Other reasons advanced are that the instruction failed to inform the jurors that if they found that defendant shot deceased in defense of his home or of his person, the jury should find defendant not guilty. At defendant's request, the court gave an instruction on self defense as well as one on defense of his home. These instructions which must be read in connection with instruction No. 3 amply preserved the rights of the defendant. The precise question was ruled by this court in State v. Clary, Mo., 350 S.W.2d 809, l. c. 813(6). Instruction No. 3 referred the jury to instruction No. 4 where various terms were defined. Referring the jury to another instruction for definitions is not error. State v. Stogsdill, 324 Mo. 105, 23 S.W.2d 22, l. c. 26(2–4).

■ In assignment eight, complaint is made of instruction No. 4 which defined "feloniously," "wilfully," "deliberately," "premeditatedly," "malice," and "malice aforethought." Such an instruction is usually given in murder cases and has been approved many times. State v. Stogsdill, supra.

In assignment nine, defendant says the court erred in not giving an instruction on manslaughter. We are of the opinion that the evidence did not justify such an instruction. The homicide was either justified on the defenses submitted to the jury, that is, self defense or defense of his home, or, if not so justified the killing was murder. The defendant, as well as the State, cited the case of State v. Creighton, 330 Mo. 1176, 52 S.W.2d 556. In that case, this court considered at length the question of what the evidence must show to require a manslaughter instruction. The court stated the general rule to be, 52 S.W.2d p. 561 (2–5): "Where the record shows personal violence—a battery—inflicted upon the slayer by the deceased at the time of the homicide, the general rule is that a manslaughter instruction is called for, State v. Bongard (Mo.Sup.Div. 2) 330 Mo. 805, 51 S.W.(2d) 84, * * *; and this is true though the evidence consist of the testimony of the defendant alone, State v. Heath, 221 Mo. 565, 581, 121 S.W. 149, 153; State v. Stewart, 278 Mo. 177, 185, 212 S.W. 853, 855." To the same effect is the ruling in State v. Bongard, 330 Mo. 805, 51 S.W.2d 84, l. c. 88, 89(3, 4), cited by the State and the defendant. Therein (51 S.W.2d l. c. 89), the rule in this state is clearly stated and is applicable to the case now before us: "But, in view of the long line of decisions cited in * * *, it appears to be well settled that the law of this state is not as liberal as in some other jurisdictions; and that to constitute adequate provocation there must be more than opprobrious words, more, even, than a demonstration with a deadly weapon imminently threatening danger—there must be actual violence to the person."

In the case of State v. Wright, Mo., 336 S.W.2d 714, l. c. 717(1), cited by the defendant, the rule set forth in State v. Creighton and in State v. Bongard, supra, was approved. In the Wright case, the court did not in fact relax the rule as defendant urges. Therein, the court ruled that in the peculiar circumstances there present (not present in the case now before us), "there was sufficient evidence of personal violence to bring the case within its terms," meaning the rule in State v. Creighton and in State v. Bongard, supra. In the case before us, there was not a shred of evidence that the deceased touched the defendant. We rule the trial court was justified in not giving a manslaughter instruction.

Defendant offered two instructions (B and C) on his theory that he shot Neiss in defense of his home, citing State v. Shiles, Mo., 188 S.W.2d 7. The court refused instruction B but gave instruction C. In our opinion, instruction C sufficiently covered this defense and the court did not err in refusing instruction B. This theory of defense was vigorously argued to the jury by the defendant and by his counsel Phelps. This tenth assignment of error has no merit.

In assignment eleven, the refusal of the court to give instruction H, offered by the defendant, is claimed to be error. This instruction would have informed the jury, in substance, that when a party places a witness on the stand, he vouches for the truthfulness of his testimony. Defendant cited a number of authorities, including 98 C.J.S. Witnesses § 477, pp. 355, 356, in support of his contention. In the argument of the brief, defendant says that the case of State v. Wright, 352 Mo. 66, 175 S.W.2d 866, l. c. 872, settles this point. Defendant says, "Glenn Powell testified the State vouched for his testimony and was bound by it." Powell, the sheriff, did testify for the State. The prosecution in no way questioned the truth of his evidence. There was no need for the court to give the requested instruction. In our opinion, the defendant has misinterpreted the authorities cited. In 98 C.J.S. Witnesses § 477, p. 355, it is stated, "As a general rule, a party cannot impeach a witness whom he has introduced either in a civil or in a criminal case." The State did not attempt to impeach the evidence of Sheriff Powell. In State v. Wright, 352 Mo. 66, 175 S.W.2d

866, it was held that in a case where the State introduces evidence of statements made by a defendant, the defendant is entitled to have the whole of the statement presented to a jury. Further, if such a statement contains matters which are favorable to the defendant, such as self defense, then the defendant would be entitled to a self-defense instruction. The State, however, is not compelled to accept as true the self-serving statements contained in a defendant's confession or admission which is introduced by the State. In the case now before us, Brookshire told the sheriff about the occurrence including what the defendant had said in justification of the shooting. The trial court gave an instruction on self defense and defense of defendant's home. That complied with the ruling in State v. Wright, 352 Mo. 66, 175 S.W.2d 866.

Defendant's last point briefed is that "The Court committed reversible error in permitting the enemies of the defendant to testify concerning the truth and veracity of the defendant, for the reason there was no testimony offered by the State that contradicted the testimony of the defendant, and for the further reason the Court abused its discretion in receiving this testimony which denied the defendant a fair and impartial trial as guaranteed to him by Article I, Sections 10 and 18a of the Constitution of Missouri, and Amendments V, VI, and XIV, Section I of the Constitution of the United States. 26 Am.Jur. 388; 20 Am. Jur. 304; 33 A.L.R. 1219." The authorities cited concern the matter of impeaching a defendant as to his good character and not as a witness for truth and veracity. The defendant testified and the State had the right to offer evidence as to his general reputation for truth and veracity. 58 Am. Jur. 372, Sec. 685; 98 C.J.S. Witnesses § 476, p. 354; 98 C.J.S. Witnesses § 512, p. 417; State v. Quinn, 345 Mo. 855, 136 S.W. 2d 985, l. c. 987(8). We cannot agree with the defendant that the State did not offer any evidence that contradicted that of the defendant. The evidence of the State as to where the deceased was shot was in direct conflict with defendant's evidence and theory.

We have examined all of the points briefed and also such matters as are required by S.Ct.Rule 28.02. Finding no reversible error, we hereby affirm the judgment of the trial court.

All concur.